668 So.2d 420 (1996)
STATE of Louisiana
v.
Harold LEE.
No. 94-KA-2584.
Court of Appeal of Louisiana, Fourth Circuit.
January 19, 1996.
*422 Harry F. Connick, District Attorney, Karen Godail Arena, Assistant District Attorney, New Orleans, for plaintiff/appellee.
Martin E. Regan Jr., Regan, Manasseh & Boshea, Baton Rouge, and Kevin V. Boshea, Regan, Manasseh & Boshea, New Orleans, for defendant/appellant.
Before BARRY, ARMSTRONG and WALTZER, JJ.
ARMSTRONG, Judge.
Defendant, Harold Lee, and his codefendant, Robert Lacour,[1] were charged by bill of information with two counts of armed robbery, violations of La.R.S. 14:64, and three counts of attempted second degree murder, violations of La.R.S. 14:27-30.1. A motion to suppress the identification was denied.
Following a trial by jury the defendant was found guilty as charged on all counts. A motion for new trial was heard and denied on October 28, 1994. The defendant was sentenced on November 18, 1994 to serve three concurrent fifty-year sentences, without benefit of probation, parole or suspension of sentence, on the attempt murder counts, to run consecutively with two concurrent ninety-nine year sentences, without benefit of probation, parole or suspension of sentence, on the armed robbery counts. A motion for *423 reconsideration of sentence was filed and denied.
The defendant now appeals, raising four assignments of error.

FACTS:
In July of 1991 Jennifer Tudyk came to New Orleans to visit her cousin, Darren Haag, and celebrate her twenty-first birthday. She came in from Texas with her friend, Karen French. Tudyk and French arrived on Friday, July 19. They went out Friday evening with Haag to celebrate. On Saturday, July 20, Tudyk and French went to dinner with Haag's parents, Tudyk's aunt and uncle. About 11:00 p.m. they were dropped at Haag's apartment. From there they went out with Haag to a dance club on Veterans Boulevard in Metairie and then to a couple of music clubs in the French Quarter. They parked several blocks away from the French Quarter in the Texaco Parking Garage on Tchoupitoulas Street because Haag was a Texaco employee and could park there free. On returning to the car about 3:00 a.m. on July 21, as they approached the corner of Lafayette and Tchoupitoulas Streets, they observed two black males standing on the opposite corner across Lafayette Street watching them. Haag testified that he didn't feel good about the situation. He told French and Tudyk to hurry up. All three quickened their pace. French turned around at some point and said, in a frightened voice, "They're coming."
As they were almost to the garage, one of the black males, later identified as the defendant, passed them, put his arm on Haag's shoulder and stuck a gun in his mouth. The defendant mumbled to Haag to give him his money. Haag saw the defendant's finger tighten on the trigger and he flinched. The defendant fired the gun and Haag fell to the ground with a grazing gunshot wound to his face. Haag heard two other shots while he was lying face down on the ground. He "played possum" when he felt someone go through his back pockets.
Tudyk saw the defendant shoot Haag, then she fell to the ground as the defendant shot her in the leg. She covered her head when she saw the defendant raise the gun again. She then heard the third gunshot, which hit French in the neck. Tudyk screamed for help. A garage attendant responded and called the police.
French testified that, after the defendant passed her, she turned and looked at the other man, who was pointing a gun at her, then gave him her purse. She then heard the gunshots behind her and tried to run, but was also shot by the defendant.
Shortly after the incident, Haag worked with a New Orleans Police Department sketch artist on a composite of the defendant. Through Crimestoppers, N.O.P.D. was advised to investigate David Lee and his brother-in-law relative to the offenses. The police later learned that it was David Lee's brother Harold, the defendant, who was suspected. Haag was shown two photo lineups, one with David Lee and one with the defendant. He positively identified the defendant. French was unable to make an identification a few days after the shooting due to pain medication; however, two weeks later she positively identified the defendant from one photo lineup and Lacour from another. Because Karen French was paralyzed from the neck down as a result of the gunshot wound inflicted by the defendant, her father signed and initialed the photos for his daughter. The day after French's identification, Tudyk was shown photo lineups in Texas. She also positively identified the defendant, and she tentatively identified Lacour. Haag never attempted to identify Lacour from a photo lineup.
Lacour pleaded guilty to reduced charges and was sentenced more than a year prior to the defendant's trial. At trial, he testified that he was not even at the scene when the crimes occurred. However, he was required to read the proffer of his testimony which had been given prior to the acceptance of his guilty plea. In his proffered testimony Lacour admitted his own participation in the crimes and, more importantly, the defendant's. This proffered testimony was detailed and consistent with the testimony related by the victims.
Dr. Edward V. Morse testified for the defense as an expert on eyewitness identifications. He named and explained twenty-one *424 factors which allegedly cause identifications to be unreliable and applied those factors to the instant case.

ERRORS PATENT:
A review of the record indicates two patent errors. The first error is the failure of the district attorney to properly sign the bill of information. Page two was signed, which would satisfy the filing of counts one through four on pages one and two of the bill. However, page three, which contains count five of the bill, was not signed. Nevertheless, an indictment shall not be invalid or insufficient because of a defect in form only. La.C.Cr.P. art. 487. The omission of the signature of the district attorney, being a formal defect only, must be taken advantage of before trial by demurrer or motion to quash. State v. White, 404 So.2d 1202, 1205 (La.1981); La.C.Cr.P. arts. 534(1), 535. The defendant did not object to the defect prior to trial; it was therefore waived.
The second patent error is an illegality in the defendant's sentence. The defendant was sentenced without benefit of probation, parole or suspension of sentence on the attempted murder counts. At the time of the offense, La.R.S. 14:27(D)(1) provided that a person who attempts an offense which is punishable by death or life imprisonment shall be punished at hard labor for not more than fifty years. The section was silent as to the benefit of probation, parole or suspension of sentence. Jurisprudentially, this has been interpreted as allowing eligibility since the statute does not dictate otherwise. State v. See, 467 So.2d 525 (La.1985); State v. Monroe, 508 So.2d 910 (La.App. 4th Cir.1987). The defendant's sentence will be amended accordingly to delete the prohibition against probation, parole or suspension of sentence on the attempted murder counts.

ASSIGNMENT OF ERROR NO. 1:
The defendant first argues that the trial court erred in denying his motion to suppress the identification. In order to suppress an identification, a defendant must prove both that the identification itself was suggestive and that there was a likelihood of misidentification as a result of the identification procedure. State v. Lee, 545 So.2d 1163 (La.App. 4th Cir.1989). The five factors that a court must consider to determine the likelihood of misidentification as a result of the identification procedure are: (1) the witness's opportunity to view the defendant at the time the crime was committed; (2) the degree of attention paid by the witness during the commission of the crime; (3) the accuracy of any prior description; (4) the level of the witness's certainty displayed at the time of identification; and (5) the length of time elapsed between the crime and the identification. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).
The defendant first submits that the makeup of the photo lineup was suggestive, in that only the defendant was shown clean-shaven. In fact, each of the fill-ins has at least a light mustache. However, as to the fill-ins in the defendant's lineup, the mustaches are so light as to be barely discernable from the shadow above the defendant's mouth in the defendant's photo. It cannot be said that there was a substantial likelihood of misidentification because of this slight distinction between the defendant and the others in the lineup.
The defendant next argues that the photo lineup for Tudyk was done two days after she viewed him in a television news report on his arrest and, thus, the identification was tainted. Tudyk testified that she did not get a good look at the defendant in the news report. In addition, she averred that the video clip shown in the courtroom, which was entered into evidence, is not the one she saw. She testified that, in the video she saw, the view was from far away of a gentleman being escorted by police against a brick wall background. The video clip of the newscast segment shown to Tudyk in court was a fairly close up view of the suspect and accompanying officers and there was no brick wall in the background. We also note that there is a significant difference between the defendant as pictured in the newscast segment and the photo identified by Ms. Tudyk in the lineup. Considering Ms. Tudyk's testimony that she had not viewed the video clip in question, we do not find that the identification was suggestive. Also, even assuming that she *425 viewed the newscast in question, because the views of the defendant shown in the newscast and as pictured in the lineup photo were significantly different, and for the reasons stated below as to the identification of the defendant as the perpetrator, we do not find that there was substantial likelihood that Ms. Tudyk misidentified the defendant.
The defendant maintains that the signatures on the back of his photo were indications to French and then to Tudyk that the other witness(es) had already selected that photo. All parties to the identification procedure testified that the identifying witnesses did not see the backs of the photos until after the selection was made. The signatures from previous lineups thus could not have affected the selections.
The defendant further argues various factors which indicate that the identifications were unreliable. The defendant avers that the identification by French should have been suppressed because she was unable to make an identification when the photo lineup was first attempted. Both French and her father testified that she was on substantial pain medication when an officer attempted to present the first lineup to her at Charity Hospital. However, she did positively identify both the defendant and Lacour when shown the photo lineups two weeks later. The fact that she could not make an identification while heavily sedated should not detract from her subsequent positive identifications.
The defendant's counsel misstates the witnesses' testimony relative to the attention paid by them to the defendant during the offense. He further misstates the case by suggesting that Haag made a tentative identification of the defendant and a possible identification of the defendant's brother, David Lee. Mr. Haag was shown separate photo lineups of defendant Harold Lee and David Lee. His identification of the defendant was positive, not "tentative," as averred by defense counsel. Sgt. Edward Rantz testified that Haag tentatively identified David Lee as possibly being the other perpetrator. This in no way undermines Haag's positive identification of the defendant as the person who shot him.
Even if the lineups were suggestive, they were still reliable in this case. All the eyewitnesses testified to having a very good opportunity to view the defendant. The lighting was good. They observed the defendant before and during the robbery and shooting. The descriptions given immediately after the event, if not detailed, were accurate. If the defendant only mumbled a few words, it is understandable that they would not have seen or noticed gold caps on his teeth. Haag was even able to assist the police in a composite sketch. The jury had an opportunity to view that sketch to determine the degree of Haag's accuracy. All of the eyewitnesses expressed certainty as to their identification of the defendant. French's refusal to make an identification when she was heavily sedated, Haag's failure to positively identify David Lee as the second suspect and Tudyk's tentative identification of Lacour indicate that the witnesses were not inclined to positively identify a suspect unless they were, in fact, positive of the identification. Finally, the time between the offense and the lineups ranged from ten to twenty-three days. Considering these factors, even assuming that the identification was suggestive, there was no substantial likelihood of misidentification.
The trial court properly denied the motion to suppress the identifications. We find no merit to this assignment of error.

ASSIGNMENT OF ERROR NO 2:
By this assignment the defendant avers that the trial court abused its discretion in denying his motion for a change of venue without a hearing and prior to voir dire. The transcript indicates that the defendant was given a hearing on the motion, as both counsel were permitted to argue prior to the court's ruling. However, the court did rule prior to voir dire.
The video clip in evidence indicates a broadcast in 1992, two years prior to trial. The scene with the defendant was taped earlier than that, but no later than 1991. The details of the incident were not given in the broadcast, but rather, the story focused on Ms. French. The prosecutor suggested *426 that a story was run at 10:00 p.m. the night before the trial. The trial judge noted that he had seen the recent broadcast. Trial courts, as a matter of caution, may properly defer the ruling on a motion to change venue until after voir dire. State v. Brogdon, 426 So.2d 158 (La.1983). However, considering that there were no assignments of error noted from the voir dire, one must conclude that seated jurors had been swayed by the pre-trial broadcasts. The defendant thus was not prejudiced by the trial court's denial of the motion to change venue.
We find no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 3:
By this assignment the defendant avers that the evidence was insufficient to prove the identity element beyond a reasonable doubt. When assessing the sufficiency of evidence to support a conviction, the appellate court must determine whether, viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987). The reviewing court is to consider the record as a whole, and if rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld. State v. Mussall, 523 So.2d 1305, 1309-10 (La. 1988). In applying this standard, the reviewing court must defer to the credibility choices and justifiable inferences of fact made by the jury. State v. Rosiere, 488 So.2d 965, 968 (La.1986); State v. Foy, 439 So.2d 433, 436 (La.1983).
The defendant argues that this case relies on victim identifications without any corroborative physical evidence. That the three victims independently identified the defendant is one form of corroboration. The further fact that co-perpetrator Lacour testified under oath at his plea naming the defendant as the shooter is another. Lacour retracted his prior testimony when called to the stand at the defendant's trial, stating that he was not even present at the scene on the night of the shooting. He claimed that he gave the prior testimony against the defendant to gain the plea bargain for himself. However, his plea bargain required only that he testify truthfully at the defendant's trial, not that he implicate the defendant. Furthermore, Lacour's proffered testimony recited details of the crime which were consistent with the facts as related by the eyewitnesses, making it unlikely that his statement was fabricated to obtain the plea. Lacour stated that the defendant had a nickel-plated gun, that defendant fired three shots at the victims, that Lacour was walking behind the group, and that after the shooting Lacour and the defendant fled in separate directions.[2]
Considering all of the record evidence, including the fact that the three eyewitnesses corroborated each other in all identifying the defendant, and further considering that their testimony of the events was further corroborated by the prior testimony of the co-perpetrator, who also named the defendant as the shooter, any rational trier-of-fact could have found the identity element, as well as all the other elements of the crimes charged, proven beyond a reasonable doubt.
We find no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 4:
By this assignment the defendant avers that his sentence is constitutionally excessive. La. Const. Art. I, § 20 (1974) prohibits excessive punishment. Punishment is unconstitutionally excessive if it makes no measurable contribution to acceptable goals of punishment and is nothing more than the purposeless and needless imposition of pain and suffering or is grossly out of proportion to the severity of the crime. State v. Telsee, 425 So.2d 1251 (La.1983).
The defendant argues that the trial court erred in imposing terms of imprisonment to *427 run consecutively, though they were part of the same scheme. La.C.C.P. art. 883 provides that terms of imprisonment for two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, "shall be served concurrently unless the court expressly directs that some or all be served consecutively." The article further provides that, conversely, "other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently."
The defendant concedes that it is within the trial court's discretion to order sentences to run consecutively or concurrently. Thus, although concurrent sentences are the usual rule for convictions arising out of a single course of illegal conduct, consecutive sentences will not necessarily be found excessive, but, rather other factors must be considered. State v. Ortego, 382 So.2d 921 (La. 1980), cert. den., 449 U.S. 848, 101 S.Ct. 135, 66 L.Ed.2d 58 (1980). Factors to be considered are prior criminal history of the defendant, State v. Underwood, 353 So.2d 1013 (La.1977); whether the defendant poses an unusual risk to public safety, State v. Watson, 372 So.2d 1205 (La.1979); the harm done to the victims, State v. Lewis, 430 So.2d 1286 (La.App. 1st Cir.1983), writ denied, 435 So.2d 433 (La.1983); and the viciousness of the crime, State v. Jett, 419 So.2d 844 (La. 1982).
At sentencing, the quadriplegic victim testified and the other victims sent statements which were read into the record. The trial judge then noted the particular heinousness of the crimes and their terrible consequences. He particularly noted that the defendant "cold-bloodedly and deliberately" tried to execute the victims, although they offered no resistance to the robbery. The trial judge further held no hope that the defendant could be rehabilitated and therefore found that he should be removed from society for as long as feasible. He then sentenced the defendant to ninety-nine years at hard labor without benefit of probation, parole, or suspension of sentence on each of the armed robbery counts, to run concurrently, fifty years without benefits on each of the attempt murder counts, to run concurrently, and had the sentences on the murder counts run consecutively to the sentences on the armed robbery counts. Considering the dangerous propensity of this defendant as demonstrated by his actions in these offenses, the consecutive sentences imposed by the trial judge are not excessive.
We find no merit to this assignment of error.
For the foregoing reasons, we affirm the defendant's conviction. We amend his sentence to delete the requirement that the three concurrent fifty-year sentences for attempted second degree murder be served without benefit of parole, probation or suspension of sentence. We affirm the sentence as amended and in all other respects.
CONVICTION AFFIRMED; SENTENCE AMENDED; AFFIRMED AS AMENDED.
NOTES
[1] On November 9, 1992, Lacour pled guilty to reduced charges of two counts of simple robbery and three counts of aggravated battery. In exchange for the reduction, Lacour agreed to testify truthfully at the trial against the appellant on the subject offenses and to give a proffer of his testimony against Lee prior to the plea being accepted by the State. Lacour's sentencing was left open pending receipt of victim impact statements. On February 18, 1993, Lacour was sentenced to concurrent seven year sentences on each of the simple robbery counts, to run consecutively to concurrent ten year sentences on each of the aggravated battery counts.
[2] Although the exhibit of Lacour's prior testimony was filed for record purposes only, Lacour was required to read the key portions from it to impeach his testimony that he was not present at the scene of the crimes.