744 So.2d 99 (1999)
STATE of Louisiana
v.
Merlin J. RAGAS.
No. 98-KA-0011.
Court of Appeal of Louisiana, Fourth Circuit.
July 28, 1999.
*101 Christopher A. Aberle, Louisiana Appellate Project, Mandeville, Louisiana, Attorney for Defendant/Appellant, Merlin J. Ragas.
Harry F. Connick, District Attorney, Charles E.F. Heuer, Assistant District Attorney of Orleans Parish, New Orleans, Louisiana, Attorneys for Appellee, The State of Louisiana.
Court composed of Judge MIRIAM G. WALTZER, Judge MOON LANDRIEU and Judge PATRICIA RIVET MURRAY.
MURRAY, Judge.
Merlin Ragas appeals his conviction for attempted aggravated rape. For the following reasons, we affirm.

STATEMENT OF THE CASE
Defendant Merlin J. Ragas was charged, by grand jury indictment, with aggravated rape, a violation of La.Rev.Stat. 14:42, and attempted aggravated crime against nature, a violation of La.Rev.Stat. 14:89.1, to which he plead not guilty. Following trial by a twelve-person jury, Mr. Ragas was found guilty of attempted aggravated rape as to count one and not guilty as to count two. He was sentenced to serve twenty years at hard labor in the custody of the Department of Corrections, without benefit of parole, probation, or suspension of sentence. The trial court denied his motion to reconsider the sentence and granted his motion for appeal.

FACTS
New Orleans Police Officer Kirk Johnson, with the Child Abuse Unit, testified that he was contacted by Officer Roland Matthews, a district officer, and, as a result, interviewed Ms. L.C., who had physical custody of B.M., the victim.[1] Officer Johnson said he asked the victim if she knew her body parts, and specifically if she knew what her vagina was, which she did. He also discussed the case with P.H., a cousin of the victim's guardian whom B.M. allegedly told about the incidents, and a Dr. White-Sims. Officer Johnson arrested Mr. Ragas after he reviewed the medical examination findings with Dr. White-Sims.
P.H., who was ten years old at the time of trial, testified at trial. After extensive questioning by the trial court, she was qualified as a witness. P.H testified that she and the victim were at P.H.'s aunt's home when the victim told her that her daddy, Mr. Ragas, had touched her. When asked if she knew what that meant, the witness first stated that she did not ask how Mr. Ragas had touched her, nor did the victim tell her. Following leading questions by the prosecution, she admitted that she had asked the victim how Mr. Ragas had touched her. The victim told her Mr. Ragas touched her private area. P.H. said she later witnessed the victim tell another child: "Guess what, when I used to live over with [M.L.] and my daddy,"... "my daddy touched me."
On cross-examination, defense counsel asked the witness whether the victim had said the touching occurred when she was living with M.L., who is the victim's biological mother, and the witness replied in the affirmative. On redirect examination, the witness admitted that the victim had not told her that she had been living with her biological mother, but that she thought she had been. The witness said: "She have to *102 live with her momma. I thought that she lived with her."
L.C. testified that she took physical custody of B.M. in August 1994, when she was three years old. At that time, she did not know who the victim's biological father was. She said Mr. Ragas's family contacted her mother, seeking to have contact with the child. L.C. began to take the victim to Mr. Ragas's family for visits, including overnight visits at her paternal grandmother's home, in December 1994. She said the victim began staying overnight, two weekends a month and on holidays, with Mr. Ragas in the beginning of January, 1995. Because of summer camp, B.M. stayed with Mr. Ragas almost daily in the summer of 1995.
L.C. stated that the victim was a well-behaved child but that she began to notice a change in the latter part of 1995. She said that approximately eight months after she had taken custody of the victim, "she had a little problem with some little boy.... It was always some kind of sex act, you know. I had a problem with her with that, you know." L.C. testified that there were times when she would drop B.M. off at her paternal grandmother's to play with the other children there. However, when she would return to pick her up, L.C. was told that B.M. was at Mr. Ragas's house.
In the latter part of 1995, L.C. said that her sister told her to talk to B.M. about how she played with her daddy. L.C. dismissed the suggestion because she did not believe that Mr. Ragas would act inappropriately with his daughter. However, also in the latter part of 1995, L.C. said she noticed a funny smell as the victim was urinating. B.M.'s urine was very yellow and she said she was "burning." L.C. thought it was a bladder infection and began giving the victim cranberry juice. She later noticed the victim "scratching a lot" and said, "she was always digging." She asked B.M. if some little boy was touching her and she said no, but she did not ask if her father was doing so. On two other occasions she asked the victim what she and her father had been talking about on the telephone, and the victim said it was a secret.
In November of 1996, L.C. took the victim to work with her. It was quiet and she asked B.M. if her daddy had touched her. L.C. said the victim looked at her for a while, began crying, and said "Momma, he always touching me. Always." When asked how often, the victim said "Every time I go over there he touches me." L.C. asked if he put his penis in her, and she said, "Yes, Momma, he did." L.C. stated that B.M. continued to repeat the story over and over. L.C. did not, however, contact the police until December of 1996, at which time Dr. White-Sims examined the victim.
L.C. admitted that she had a boyfriend who would sleep over, but that the victim did not know this. She said the victim never complained about her boyfriend. She also said she specifically asked the victim whether he had ever touched her and she said, "Oh, no, Momma, not Mr. Alvin."
On cross-examination, L.C. explained that she was not related by blood to B.M. or her mother. She learned through a friend that B.M.'s biological mother wanted to give the child up. She testified that she was in the process of adopting B.M., but at the time of trial, she only had legal custody. L.C. was questioned about her previous reference to sexual behavior on the part of the victim. She said there had been only two incidents. On one occasion someone from school wrote L.C. a letter advising her that the victim had placed her hands in her panties and then had a little boy smell her hands. On the second occasion, a babysitter informed her that the victim and her nephew had been "playing nasty, you know, you know, on top of one another" in the back yard. L.C. also testified that after she obtained custody of the victim, B.M.'s biological mother never visited, and after the mother married, she never asked if the child could come live or *103 visit with her and her new husband. It was her opinion that Mr. Ragas's family spent more "quality time" with the victim than Mr. Ragas did. L.C. said that Mr. Ragas contributed very little to the support of the victim. Defense counsel asked L.C. if there was a "bone of contention" between her and Mr. Ragas about B.M.'s support. She replied that if she asked him for money for certain things and he refused, she would just buy the needed items herself. She did, however, comment that his refusal to pay would mean that he would see B.M. less. L.C. changed her story somewhat on cross-examination, testifying that her family told her about the molestation in October or November of 1996, and she did not ask B.M. about it until December 1996. On direct examination, she said that everything came to light in November of 1995.
B.M., the victim, was questioned by the court for qualification purposes. She stated that she was six years old, and entering the second grade. She correctly counted the number of jurors. The witness said people were supposed to tell the truth, and that people who lie get punished. She said she thought that God and the bishop of her church would want her to tell the truth to other people, including the twelve jurors, and she promised to tell the truth.
The victim was asked if she remembered that something bad happened to her and she replied in the affirmative. When asked if someone did something bad to her, the victim replied, "My daddy." She said that when she was sleeping in her daddy's bed, he "put his thing in mine." She said Mr. Ragas removed her clothes first, then pulled his pants down, and got on top of her. She said it hurt, and she cried. She also said Mr. Ragas made her perform oral sex. She testified that these incidents happened "[a]lot." The witness said she remembered telling P.H. about what happened, and telling her mother (L.C.) at her office. She also stated that she remembered telling Det. Johnson what happened, but not the doctor. B.M. stated that she loved her daddy, but knew what he did to her was bad.
On cross-examination, the victim was questioned regarding anyone telling her what to say, as follows:
Q [L.C.] told you had to  what you had to get up here and say?
A Yep.
Q Huh?
A Yep.
Q What did she tell you?
A She said that God is on the side of me and I will do good.
Q I'm sorry, what?
A She said God was on side of me and I'm gonna do good.
Q And so she said to get up here and make sure you tell your story.
A Yep.
Q Make sure you say these things that you've already told other people.
A Yes.
The victim said she did not remember any specific occasion when these things happened, such as Christmas, Thanksgiving, Easter or Mardi Gras. When defense counsel asked her if she told P.H. that "these bad things happened to you when you were living with [the birth mother]," B.M. responded affirmatively. B.M. remembered when she lived with her birth mother, her brother and sister also lived there.[2] She could not, however, remember when she began visiting with Mr. Ragas or where, or the names of the other children at her grandmother's house with whom she played. She remembered going to summer camp, and that she had fun, but she could not remember any of the camp activities. B.M. did not remember if she ever visited her birth mother, or if her birth mother visited her. She could not *104 remember the last time she saw her birth mother, or her brother or sister. She said neither her daddy nor L.C. ever spanked her for doing anything wrong. When questioned about the problems in school with her male schoolmate, B.M. did not remember any incident.
On redirect examination the victim testified that Mr. Ragas told her not to tell anyone about the incidents. She denied that she was only repeating what the prosecutor or her mother (L.C.) told her to say. She said she was telling the court what happened because it happened to her.
Dr. Suzanne White-Sims, a pediatrician employed by LSU Medical Center, was qualified by stipulation as an expert in the fields of pediatrics and emergency medicine. She testified that she had performed several thousand examinations on children for sexual abuse, and detailed the procedure for performing such examinations. She testified that she performed an examination on the victim in the instant case on December 6, 1996. The victim gave a history of her father, Mr. Ragas, touching her with his hands and his genitals. The victim told Dr. White-Sims that the incidents always happened when she was in bed, and said that she would try to close her eyes and think that it was not happening. The victim also stated that she would tell her daddy to stop, but he would not. Dr. White-Sims denied that the victim told her Mr. Ragas performed oral sex on her, but that he would ask her to perform oral sex on him, and that he would try to put his penis in her mouth. The victim also told the doctor that Mr. Ragas tried to put his penis in her rectum. B.M. told the doctor that these incidents took place in a four-bedroom house where the "grandfather slept downstairs." L.C. told the doctor that the "grandfather" was really an uncle.
Dr. White-Sims testified that the physical examination revealed that the victim's hymen was missing, with a remnant portion being thickened. She stated that the thickening was most likely the result of healing after a trauma. She also found that the "rugae," folds or wrinkles of visceral tissue, was missing from the eleven to one o'clock position of the victim's rectum. Dr. White-Sims did not know if this was normal for B.M., or the result of trauma, but opined that it was normal. She stated that the physical findings would not be consistent with a straddle injury or with gymnastics. She stated that, based on her physical examination, someone had tampered with the victim's bottom. She said the physical examination corroborated the victim's history that someone had penetrated her hymeneal area, and the finding was consistent with both digital and penile penetration over a long period of time. She could not say that the physical findings corroborated anal or oral sex.
On cross-examination, Dr. White-Sims admitted that no history had been given to her that the victim had engaged in sex play with other children. She stated that the victim denied any bleeding, but that with breakage of the hymen, some bleeding would be expected, as little as a drop. However, Dr. White-Sims said on redirect examination that she would not expect any bleeding after three days. The doctor admitted that she knew she was performing a rape examination and that she was looking for evidence to corroborate the history given by the victim. Contrary to her testimony on direct, Dr. White-Sims stated that the victim related that she had oral sex with her father. The doctor admitted that the trauma to the hymen was healed indicating that it was an old trauma.
LaTacha Jones testified on behalf of defendant. She stated that she had known Mr. Ragas since 1991, and that from February to June of 1996, they lived together. They were both students at Southern University in New Orleans, and she knew that Mr. Ragas worked at the V.A. Hospital in a work-study program. She testified that between 1991 and 1996, Mr. Ragas lived with his mother, father, uncle and his brother. She said that she was present at his home on two occasions when the victim *105 was there. Jones stated that the victim would not be there very long because Mr. Ragas would leave either for work or school.
M.L., the biological mother of the victim, testified for the defense. She said she and Mr. Ragas never lived together, and when the victim still lived with her, he rarely saw his daughter. She said she never visited Mr. Ragas in an apartment that was strictly his own.
Patricia Ragas, defendant's mother, testified that in 1991 Mr. Ragas was living with her at her mother's home, with her husband, her other son, and her two granddaughters. She said the victim would visit sometimes during 1994 and 1995, and that most of the time Mr. Ragas was not there. She denied that Mr. Ragas and his daughter ever bathed together. According to Mrs. Ragas, there was always a child at the home near the victim's age. She said when the victim spent the night she would sleep with her and another granddaughter, or with Mrs. Ragas's daughter and one of her granddaughters. Mrs. Ragas testified that under no circumstance would a child as young as the victim be placed in a bed to sleep alone. She said that to her knowledge Mr. Ragas never had his own apartment, but later explained that after she left Louisiana in 1996, he may have. The victim never complained to her about any abuse, never complained to her about anyone being mean to her, and never had any difficulties in relating or playing with the other children. She stated that her daughter and her two granddaughters, ages eight and two at the time of trial, lived at the residence with Mr. Ragas.
On cross-examination, Mrs. Ragas admitted she was not at home twenty-four hours a day, because she worked a full-time job. She also admitted that she could not say where the victim slept if she slept at Mr. Ragas's grandmother's residence. She knew of only one time that Mr. Ragas took the victim out, and that was to buy shoes.
Mr. Ragas testified that he served three years in the U.S. Navy, getting out in June 1990, and that he had been in the naval reserves since then. He said he was then pursuing a bachelor's degree in electrical engineering at Southern University. Mr. Ragas testified that B.M. lived with him at his grandmother's house from January to December 1993.[3] For a time after that, he did not know where his daughter was, but she began visiting him again in 1995, after she began living with L.C. He denied that any other children lived at his grandmother's home. He denied bathing with his daughter. Mr. Ragas stated that if L.C., who had custody of the victim, took the victim to "his apartment," he would usually take her either to his mother's residence or his grandmother's residence. He said he and his daughter enjoyed a good relationship, and that B.M. presented no disciplinary problems. He said he would take her to McDonald's, her favorite place to eat, or shopping if she needed clothes or shoes.
On cross-examination Mr. Ragas said that he knew of no reason why his daughter would say anything that was not true. He said, in general, that children do tend to exaggerate a little bit. When asked if a child claiming that her father was having sex with her would be a small or a large exaggeration, Mr. Ragas replied, "That would be a major exaggeration." He stated that B.M. never told him that any other man did anything to her. He admitted that L.C. had been dropping the victim off at his house since 1994, but said he would take her to his mother's home so she could *106 play with other children. He denied sleeping with his daughter, and reaffirmed that he has never lived alone at the address where he has resided since 1994. L.C. never informed him of any problems the victim was having at school.

ERROR PATENT:
A review of the record reveals one error patent.
Mr. Ragas was charged with committing an aggravated rape between December 1, 1994 and May 31, 1996, and was convicted of attempted aggravated rape, a violation of La.Rev.Stat. 14:27(42). He was sentenced to imprisonment with the stipulation that the sentence be served without benefit of parole, probation, or suspension of sentence. However, prior to August 18, 1995, a sentence for an attempt to commit a crime punishable by life imprisonment, such as aggravated rape, was punishable pursuant to La.Rev.Stat. 14:27(D)(1)[4] by a term of imprisonment at hard labor, with no stipulation that it be served without benefit of parole, probation, or suspension of sentence. The absence of such a stipulation has been interpreted as allowing eligibility because the statute does not dictate otherwise. State v. Lee, 94-2584, p. 4 (La.App. 4 Cir. 1/19/96), 668 So.2d 420, 424, writ denied, 96-0477 (La.5/10/96), 672 So.2d 919. When a criminal statute is amended to increase the possible penalty for violation of that statute, the enhanced sentence cannot be imposed upon a defendant convicted of violating the statute prior to the effective date of the amendment. State v. Smith, 96-1041, p. 3 (La.App. 3 Cir. 2/5/97), 688 So.2d 1285, 1286.
The indictment charging Mr. Ragas covers an eighteen-month period. During a little more than nine months of that period, punishment for the offense for which he was convicted carried the stipulation without benefits. The evidence established that the victim did not begin to visit Mr. Ragas or his family until December 1994. L.C., who had custody of the victim, testified that she first noticed a problem in November 1996. Dr. White-Sims examined B.M. in December 1996. There are no specific dates indicating when a rape or attempted rape of the victim occurred, and it is unclear why the indictment stops at May 31, 1996.
Viewing all of the evidence in a light most favorable to the prosecution, no rational trier of fact could have found beyond a reasonable doubt that at least one act constituting the crime of attempted aggravated rape occurred on or subsequent to August 18, 1995. That is, the evidence is insufficient to establish beyond a reasonable doubt that an offense occurred after the effective date of the 1995 amendment to La.Rev.Stat. 14:27(D)(1). Such a conclusion would be purely speculative.
Accordingly, we amend the sentence to delete the stipulation that it be served without benefit of probation, parole, or suspension of sentence.

ASSIGNMENT OF ERROR :
In Mr. Ragas' sole assignment of error, he argues that the evidence is insufficient to sustain his conviction.
This court set out the standard for reviewing convictions for sufficiency of the evidence in State v. Egana, 97-0318 (La.App. 4 Cir. 12/3/97), 703 So.2d 223, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 *107 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La. 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
97-0318 at pp. 5-6, 703 So.2d at 227-28.
Mr. Ragas was charged with aggravated rape of a person under the age of twelve years old, in violation of La.Rev.Stat. 14:42(4), and was convicted of attempted aggravated rape, a legislatively provided responsive verdict to the charge of aggravated rape. La.Code Crim. Proc. art. 814(8).
A judge or jury may return a legislatively provided responsive verdict, whether or not the evidence supports the verdict, as long as the evidence was sufficient to support a conviction of the charged offense and defendant fails to contemporaneously object. State v. Schrader, 518 So.2d 1024, 1034 (La.1988), cert. denied, Schrader v. Whitley, 498 U.S. 903, 111 S.Ct. 265, 112 L.Ed.2d 221 (1990); State v. Brown, 591 So.2d 791, 793 (La. App. 5 Cir.1991).
The elements of aggravated rape are: (1) an act of anal or vaginal sexual intercourse, (2) with a person, (3) committed without the person's lawful consent, (4) where there is the slightest penetration, (5) when the victim is under the age of twelve years. La.Rev.Stat. 14:41; 14:42.
The victim, who was only six years old at the time of trial, testified that Mr. Ragas removed her underwear, pulled his pants down, and "put his thing in mine," meaning that he put his penis into her vagina. The evidence established that Mr. Ragas had the opportunity to commit the offense or offenses. The victim related the incidents to her guardian and her guardian's cousin, and the medical evidence confirmed that the victim's vagina had been penetrated.
Mr. Ragas attacks the victim's credibility, asserting that her testimony "is more the product of coaching and rehearsal than recollection of actual personal experience." B.M. admitted that she reviewed her testimony with the prosecutors, and that she was told to testify at trial as to what she had already told people about the offenses. However, this is not evidence that the victim was told to testify untruthfully. The six-year-old victim, who was to turn seven the month after trial, was unable to recall specifically when the offenses occurred, and, in fact, told a playmate that the offenses occurred when she was living *108 with her birth mother and her daddy. However, several adult witnesses, including B.M.'s birth mother, testified that the birth mother and Mr. Ragas never lived together.
It is well-settled that credibility decisions by the jury should not be disturbed unless such finding is clearly contrary to the evidence. State v. Harris, 624 So.2d 443 (La.App. 4 Cir.1993), writ denied, 93-2609 (La.6/24/94), 640 So.2d 1339. A reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. State v. Smith, 600 So.2d 1319, 1324 (La.1992).
Viewing all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have accepted the victim's testimony, and considering the supporting evidence, found all of the essential elements of the offense of aggravated rape present beyond a reasonable doubt. Therefore, the jury properly returned the responsive verdict of attempted aggravated rape.

CONCLUSION:
For the foregoing reasons, we affirm Mr. Ragas' conviction, amend his sentence to delete that portion stipulating that it be served without benefit of probation, parole, or suspension of sentence.; and affirm the sentence as amended.
CONVICTION AFFIRMED; SENTENCE AMENDED, AND AFFIRMED AS AMENDED.
NOTES
[1] To protect the identity of the victim, and another child, who testified at trial, only initials will be used to identify some of the parties.
[2] B.M. testified that at the time of trial her brother was eight and her sister was three. Trial of this case took place three years after B.M. was placed in L.C.'s custody. It is unlikely that her sister had been born when she left her birth mother's home.
[3] There is great confusion in the record concerning where Mr. Ragas lived and with whom. A close reading of the various testimony seems to indicate that from August 1994 to June 1995, Mr. Ragas lived with his grandmother, uncle and cousin at 3100 Flora Lane. From June 1995 to September 1995, only his uncle lived at that address with him. From September 1995 until March of 1996, his father, mother, uncle, and brother lived with him, and from March 1996 through May 1996, only his uncle lived with him.
[4] La.Rev.Stat. 14:27(D)(1) was amended by Acts 1995, No. 988, § 1, to provide that a sentence under that section be served without the benefit of parole, probation, or suspension of sentence. That amendment became effective on August 18, 1995.