828 So.2d 1165 (2002)
STATE of Louisiana
v.
Duvander HURST.
No. 2001-KA-1817.
Court of Appeal of Louisiana, Fourth Circuit.
September 25, 2002.
*1167 Harry F. Connick, District Attorney, Anne M. Dickerson, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellee.
John H. Thomas, New Orleans, LA, for Defendant/Appellant.
(Court composed of Judge JAMES F. McKAY III, Judge DENNIS R. BAGNERIS, SR., Judge MICHAEL E. KIRBY).
Judge MICHAEL E. KIRBY.
STATEMENT OF THE CASE:
On July 29, 1999, the defendant was charged by grand jury indictment with second degree murder. La. R.S. 14:30.1. He was arraigned and pled not guilty August 8, 1999. A twelve member jury found him guilty as charged June 27, 2000. He filed motions for new trial and post-verdict judgment of acquittal which were denied September 15, 2000. He was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. He filed a motion for reconsideration of sentence which was denied. He filed a motion for appeal. The record was lodged in this court September 25, 2001. He filed a brief June 12, 2002. The State filed a brief July 23, 2002, and a supplemental brief July 25, 2002.
ERRORS PATENT:
None.
FACTS:
Allen Delatte, nineteen, was killed outside the New Orleans Superdome following an event known as the Super Fair on June 7, 1999. He was shot from the back from some distance in a manner that indicated he may have been running when he was wounded.
Officer Bradley Tollefson said that when he arrived at the scene, there was a large crowd leaving the fair, and that several of the victim's friends and family were present. These people said they were with the victim, heard the shots, and were running with him when he was hit. No witness could identify the perpetrator. Tollefson learned from Detective Davillier, who was also on the scene, that two black men, who had later left the scene, reported to them that two perpetrators had driven by in a red 1993 Oldsmobile with primer paint on the right door.
A 911 tape was played to the jury which revealed that minutes after the shooting the car was described as a 1993 Oldsmobile Cutlass with primer paint on the passenger door.
Detective Archie Kaufman, Homicide, took over the case. He learned from Detective Norman McCord that the suspect's nickname was "Chevy" or "Duvan". He spoke with Detectives Jerry Kuhn, Jerry Farve and Walter Powers of the Second *1168 District. He learned that "Duvan-Chevy" was Duvander Hurst. He prepared a photographic line-up. He also obtained a search warrant for the defendant's house and an arrest warrant for his person. During the search of the house, he found a receipt for Johnny's Auto Repair, a car body repair shop that was a short walk from defendant's residence. He found the vehicle inside the shop and spoke to the owner of the shop, Johnny Yrle. Yrle said he had pulled the car inside the shop from the street that morning, June 8; and that although the car had been at the shop since June 3, it had been left on the street unsecured prior to that time. The area of the car where the spots of primer had been was being worked on. A search of the vehicle revealed it was registered to Louis J. Silva, Jr. and Duvander Hurst. A picture of a man holding a large amount of cash was also seized from the vehicle.
Later, Kaufman went to the Second District to speak to William Varnedo who was in custody at the time. Varnedo told investigators there that he wanted to speak to the investigator handling the Superdome incident. During his conversation with Kaufman, Varnedo identified the defendant as the killer. Varnedo said he lived in the same neighborhood as the victim and had been at the Superdome the night the incident occurred. He identified the defendant in the photographic lineup and said his nickname was Chivas or Chevy.
The defendant turned himself in. In a statement, he said that on the night of the crime he had gotten a ride to the Superdome with Albert Luckettee and Corey Madison, who owned a red four door Buick Skylark in which they were driving. After the fair, the three went to Rally's on Carrollton Avenue and then went home. He said he was not present during the shooting.
Corey Madison's mother contacted Kaufman. Kaufman spoke with Madison. He learned that the defendant had attempted to call Madison ten times from Orleans Parish Prison after he was arrested for this crime.
Also, Luckettee told Kaufman the defendant had tried to contact him.
Davillier said he was working a paid detail the night of the crime. He was in the area breaking up fights between fair attendees when he heard two shots. The area was packed with people, and Davillier did not see the victim fall. The crowd stampeded. Witnesses pointed Davillier in the direction from which the shots had come, and he found two casings in the street. Two men told him that "the car" was red with primer paint on it, and that it had headed in the direction of Interstate 10. Davillier did not see the car. The men left the scene.
The defendant's mother, Ethel Hurst, said she learned about the shooting on television the next day. She did not remember a reporter coming to her house prior to the defendant's arrest. After she watched a tape of the broadcast played to the court room, she said that in fact she had been interviewed. She said the defendant had in fact told her that he had been at the Superdome and had heard the shots, but that he had not been involved in the crime. She said he could not have been in his red car the night of the crime because it was in the shop. She did not actually see the car in the shop, but she had a "paper" to show that it was indeed in the shop. She did not know Louis Silva. She had never seen the defendant with a gun, although he had been arrested for armed robbery. She said she remembered that he had been arrested for marijuana possession, but she did not remember he had been arrested for cocaine.
*1169 Yrle said the defendant took the car to his shop June 3, but that he left the car outside on the street. Yrle pulled the car into the shop ten minutes before the police arrived.
William Varnedo testified; but before he did, the trial court, upon motion, cleared the court room of members of the defendant's family and friends because the court heard evidence that the witness and his family had been threatened. Varnedo then said he was at the fair, and that a fight broke out as the fair was ending between "Pigeon Town and some dudes from Philip and Claverie in the Third Ward." Varnedo did not engage himself in the fight because his girlfriend was accompanying him. The defendant, "Chevas", however, was in the fight. The police arrived and broke up the fight, and the crowd separated. Varnedo saw the red Cutlass pass. The defendant was driving. A man jumped out of the front driver's seat and fired the shots. Varnedo said the car depicted in photographs he was shown at trial looked like the defendant's car.
He also said that he told the officers what he knew about the crime after he had been arrested for possession of crack. He did not know he would have to testify in court. He said he did not want to have anybody to be forced to spend his life in prison because he himself had been in prison and hated it. He felt "everybody should be forgiven."
On cross, he said that he had in fact told the officers in his initial interview that the shooter got out of the back seat of the car. He said that he knew from media reports, before he talked to the officers, that the defendant was a suspect in the crime. He admitted that he had been given the benefit of the diversionary program as a first offender in the cocaine case for which he was currently in custody, even though he had been offered diversion previously as a heroin offender.
The defense called Bobby Williams, cousin of the victim, who said he witnessed the crime, and that the shooter was six feet tall and looked nothing like the defendant. Williams admitted he was in jail in connection with the retaliation killing of Timothy Stovall.
Keyon Minor said he witnessed the shooting, and that the shooter was a "tall red dude", not the defendant.
Christopher Scott said the perpetrator was a tall man, not the defendant.
ASSIGNMENT OF ERROR ONE:
The defendant filed a motion in limine to prevent a playing of a videotape which contained a compilation of various news stories surrounding the crime. The stories had appeared on various of the major news stations in the metropolitan region. The trial, after ascertaining that the State had a witness to establish the chain of custody, and limiting the jury's viewing solely to an interview with Ethel Hurst, viewed the tape. After learning that the State would call Ethel Hurst, the trial court allowed the evidence.
On appeal, the judge defendant complains about the jury having viewed the excerpt of the tape which involved a report from WWL-TV, the New Orleans CBS affiliate. The excerpt showed a black woman using her house door to shield her from the cameras such that only a hand was visible. The woman said on the tape that she was the defendant's mother, that he had told her that he had been at the fair, and that he had said that he had nothing to do with the crime.
The defendant complains that allowing the jury to view the tape was an introduction of impermissible hearsay within hearsay. Specifically, the defendant argues that the reporter should have been called *1170 to the stand, that the defendant did not testify, and that the only way the State laid a proper foundation was to call Gail Guidry, custodian of records for WWL.
The defendant cites absolutely no law to support this assignment except a cursory reference to La. C.E. arts. 802[1] and 805[2].
The first level of the "hearsay within hearsay" of which the defendant complains involves the statements of the defendant to his mother. The second level involves the statements by the mother to the reporter. Addressing the latter first, hearsay is defined as "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." La. C.E. art. 801. Here, the statement was made by the declarant, Ethel Hurst, who testified at trial and admitted she had made the statement. As such, the statement does not fall under the definition of hearsay.
As to the hearsay argument concerning the defendant's statement to his mother that he was at the scene of the crime, that statement was a statement against his interest. La. C.E. art. 804(B)(3) specifically sets an exception for statements against interest.[3] The evidence was properly admitted. This assignment is without merit.
ASSIGNMENT OF ERROR TWO:
The defendant argues that the trial court erred in overruling objections to questions of his mother concerning his prior criminal history. The defense questioned the mother as to whether she had ever known her son to be a violent person or to carry a gun, to which she responded that he was not violent and that she had not seen a gun. The prosecutor then asked her about the defendant's prior arrests for armed robbery, possession of cocaine and possession of marijuana and his conviction for theft of goods under $100.00.
The defense opened the door to evidence concerning the defendant's character. A witness may be cross-examined on any matter relevant to any issue in the case. La. C.E. art. 611. Character witnesses may be cross-examined concerning relevant specific instances of conduct. La. C.E. art. 405. The State has the right to rebut testimony elicited form a witness by the defense. State v. Koon, 96-1208, p. 25 (La.5/20/97), 704 So.2d 756; State v. Asberry, 99-3056, (La.App. 1 Cir. 2/16/01), 808 So.2d 472, writ denied XXXX-XXXX (La.3/8/02), 810 So.2d 1154.
The questions were proper. This assignment is without merit.
ASSIGNMENT OF ERROR THREE:
The defendant argues that he was entitled to a mistrial based upon the admission *1171 of the exact same evidence discussed in the above assignment. This argument has no merit.
He also argues he was not given critical evidence until the day of trial. Specifically, he argues he did not know about the videotape. He also makes a cursory statement concerning the unavailability of other evidence.
In response to a motion for mistrial filed on the basis of "trial by ambush", the State told the trial court that in fact the evidence had always been available for the defendant to review. The trial court then denied the motion.
The record contains portions of a police report stamped by the court December 22, 1999, which clearly sets out that the videotape existed. The minute entry of that date also establishes that the State informed the defense of its intent to use an inculpatory statement. The minute entry of October 29, 1999 establishes that the State filed a copy of the police report. A State answer to discovery on December 22, 1999 establishes that the State referred the defense to crime lab reports.
The defendant's assertion that the State withheld evidence until the start of trial is not supported by the record.
This assignment is without merit.
ASSIGNMENT OF ERROR FOUR:
The defendant argues the trial court erred in not allowing him to present expert testimony from a licensed civil engineer who was a firearms expert.
During the State's case in chief, firearms examiner Byron Winbush testified that a 9 mm. bullet and a .38 caliber bullet are indistinguishable. "We're talking about micrometers of a degree off, which you could never see with the naked eye and you could never measure to a perfect degree." The autopsy report showed that a .38 caliber slug had been recovered from the body whereas the crime scene report showed that casings found at the scene were from a .9mm weapon.
The defense called Richard Scheirman, a civil engineer, in an attempt to show the jury that the difference between the two types of bullets is easily measurable. Scheirman said that he had a B.S. in civil engineering and that he had been to ballistics schools when he was in the navy. The defense attempted to qualify him as an expert in engineering, weights, measurements, and ballistics. The court found that he was not an expert in ballistics weighting and ballistics measurements, although he might have been qualified as a civil engineer.
Article 702 of the Louisiana Code of Evidence governs the qualification of expert witnesses and the admissibility of expert testimony. This article states that, "[I]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact and issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Generally, the determination of whether to qualify a witness as an expert under Article 702 is within the sound discretion of the trial judge. Clement v. Griffin, 91-1664 (La.App. 4 Cir. 3/3/94), 634 So.2d 412. Trial judges are thus afforded "great latitude" in deciding whether a prospective expert has the confidence, background, and experience to testify as an expert. Although such discretion is not absolute, Adams v. Chevron U.S.A., Inc., 589 So.2d 1219 (La.App. 4 Cir.1991), the trial court's decision to qualify an expert witness will not be overturned absent manifest error. Longman v. Allstate Insurance Co., 93-0352 (La.App. 4 Cir. 3/29/94) 635 So.2d 343.
*1172 Experience alone may be sufficient to qualify a person as an expert. Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544 (La.App. 1 Cir. 3/11/94) 634 So.2d 466. Prior qualification is a factor used by courts in determining whether someone should be qualified as an expert witness. State v. Bourque, 622 So.2d 198 (La.1993). Bias does not preclude a witness from being qualified as an expert. State v. Gray, 533 So.2d 1242 (La.App. 4 Cir.1988).
Here, the witness testified he did not inspect firearms as an occupation. He had never done any research specifically regarding bullet size or any research targeted directly towards ballistics. Although the witness had testified in civil cases, there was no evidence presented that he had ever been qualified in a criminal case. The trial court did not err in finding that the witness was not an expert in ballistics weighting and ballistics measurements, although he might have been qualified as a civil engineer.
The defendant argues he should have been able to proffer evidence that the bullets were capable of being distinguished by weight. However, the witness had never examined the bullets in this case.
This assignment is without merit.
ASSIGNMENT OF ERROR FIVE:
The defendant argues insufficient evidence.
This court set out the well-settled standard for reviewing convictions for sufficiency of the evidence in State v. Ragas, 98-0011 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La. 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987). *1173 98-0011 at pp. 13-14, 744 So.2d at 106-107, quoting State v. Egana, 97-0318, pp. 5-6 (La.App. 4 Cir. 12/3/97), 703 So.2d 223, 227-228.
Defendant was convicted of second degree murder, a violation of La. R.S. 14:30.1, which provides in pertinent part that it is the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm.
Defendant attacks Varnado's credibility. In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Jones, 97-2591, p. 7 (La.App. 4 Cir. 9/8/99), 744 So.2d 165, 169. A factfinder's credibility decision should not be disturbed unless it is clearly contrary to the evidence. State v. Harris, 99-3147, p. 6 (La.App. 4 Cir. 5/31/00), 765 So.2d 432, 435. Here, Varnado told officers that the defendant shot the victim. The defendant argues that Varnado was in police custody when he made the statement and that he got a lenient sentence for his cocaine crime. The jury was aware of these facts and was free to assess his credibility in light of that evidence. Furthermore, although Varnado refused to state directly, during trial, that the defendant was the killer, the jury heard him state that the defendant was driving the car, and that the shooter emerged from the driver's seat minutes after Varnado saw the car pass. The jury was free to weigh that testimony in the light of Varnado's obvious fear of the defendant and of potential retaliation. The jury chose to believe Varnado, and this court cannot reverse that credibility finding. State v. Huckabay, 00-1082 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093.
The defendant suggests that the ballistics evidence suggest that there was more than one gun used in the crime. This assertion is not supported by the record.
This assignment is without merit. For the reasons stated above the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] La. C.E. art. 802 provides: "Hearsay is not admissible except as otherwise provided by this Code or other legislation."
[2] La. C.E. art. 805 provides: "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided by legislation."
[3] La. C.E. art. 804(B)(3) provides:

B. Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
(3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.