954 So.2d 779 (2007)
STATE of Louisiana
v.
Vincent T. ALLEN.
No. 2006-KA-1434.
Court of Appeal of Louisiana, Fourth Circuit.
March 7, 2007.
Sherry Watters, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant, Vincent T. Allen.
Eddie J. Jordan, Jr., District Attorney, Graham L. Bosworth, Assistant District Attorney, Alyson R. Graugnard, Assistant District Attorney, New Orleans, LA, for The State of Louisiana/ Appellee.
(Court composed of Judge JAMES F. McKAY, III, Judge LEON A. CANNIZZARO, JR., Judge ROLAND L. BELSOME).
LEON A. CANNIZZARO, JR., Judge.
The defendant, Vincent T. Allen, was charged by bill of information with manslaughter, a violation of La. R.S. 14:31, for the killing of Llewellyn Howard. Following a trial, a twelve-person jury found him guilty as charged. The trial court judge *781 sentenced the defendant to forty years at hard labor. The defendant appealed.

FACTS
Cedric Howard, the victim's younger brother, testified that at the time of the killing he and Llewellyn were residing in the family home at 2114 Tricou Street. On the night of February 21, 2003, Cedric went to sleep at approximately 11:00 p.m., but Llewellyn was not in the residence at that time. At approximately 2:30 or 3:00 a.m., the doorbell rang, awakening Cedric. When Cedric answered the bell, the defendant, who lived in the 2000 block of Tricou Street, was standing at the door. He told Cedric that he and Llewellyn had gotten loaded at the Howard residence several hours earlier and he had forgotten his wallet. According to Cedric, the defendant was acting crazy, saying: "I want my F-ing wallet. I want my F-ing wallet." Cedric telephoned his other brother, Elston, and handed the phone to the defendant, who spoke to Elston for perhaps thirty seconds. When Cedric got the phone back, Elston advised him to just lock the iron door gate. Cedric then went to Llewellyn's room and told Llewellyn that the defendant was outside saying that Llewellyn had his wallet. Llewellyn got dressed, and he and Cedric went outside. Llewellyn and the defendant searched the defendant's car, which was in the Howards' driveway. A female was in the back seat of the car.
Cedric said Llewellyn and the defendant then entered the car and drove to the 2000 block of Tricou Street, where they pulled into the defendant's driveway. Llewellyn and the defendant walked into the street, where the defendant began punching Llewellyn in the head, causing him to fall to the ground several times. Cedric said the defendant was yelling: "I want my F-ing wallet. There going to be a death wish tonight. I want my F-ing wallet." The female who had been in the car had stepped out. Cedric said he went inside and called 911. When the police arrived, Llewellyn and the defendant were still in the 2000 block of Tricou Street. Cedric testified that the police stayed approximately thirty seconds. After the police left, the defendant and Llewellyn came walking back towards the Howard residence. Cedric said the defendant continued to punch Llewellyn in the head and rant about wanting his wallet, stating at one point, again: "There going to be a death wish tonight." Cedric heard the defendant say at another point: "I'll do 30 years. I want my f-ing wallet." Again, the defendant hit Llewellyn, causing him to fall. The defendant then stood over Llewellyn, choked him and banged his head on the pavement. Cedric said he went inside, and when he came back out the two men had walked back to the 2000 block of Tricou Street. The fighting stopped, and the defendant, Llewellyn and the female got into the defendant's car and drove off. Elston Howard arrived, and he and Cedric drove off in the same direction looking for the defendant's car. They drove around for about ten minutes, but could not find it so they returned to the Howard residence. Cedric estimated that he stayed at his home for approximately one hour and forty-five minutes before leaving for his girlfriend's home in Metairie. While enroute, he received a phone call from his neighbor informing him of Llewellyn's death. Cedric testified that he gave the defendant's name to police, and later identified the defendant in a photo lineup.
Elston Howard testified, corroborating Cedric's testimony.
Herbert Rubin, the Howards' next door neighbor, testified that he was awake in the early morning hours of February 22, *782 2003, because he had to take his wife to the hospital. He testified that he knew both the defendant and Llewellyn and had seen the fight between them. He said the defendant punched Llewellyn in the face several times, causing him to fall, but Llewellyn did not react. Mr. Rubin also heard the defendant say, "Give me my wallet, Dog or we going go down in a funny style." Mr. Rubin also observed the defendant, who was then in a little white car, back out of the driveway and drive across the street to another driveway. Shortly thereafter, Mr. Rubin saw Llewellyn and the defendant coming down the street again, fighting. Again, Llewellyn fell to the ground and did nothing to defend himself. Mr. Rubin also saw a female in the street who was urging the defendant to leave. When the fighting stopped, Mr. Rubin heard the defendant say, "Why you didn't tell me this before?" The defendant and Llewellyn then walked away together, got into the defendant's vehicle, along with the woman, and left.
Mr. Rubin further testified that he left to go to the hospital with his wife, and returned home at 5:00 or 6:00 a.m., to find an ambulance and fire trucks on the scene. Llewellyn Howard had been taken to the hospital by that time. Later that day, the police presented a photo lineup to him, in which he identified the defendant as the person he saw beating Llewellyn and whom Llewellyn drove off with shortly before he was killed. Mr. Rubin acknowledged on cross examination that after the fight ended he had observed Llewellyn walk unaided to the defendant's car and get into the passenger seat.
Dr. Richard Tracy, a pathologist, identified a report of the autopsy he had performed on the body of Llewellyn Howard. The victim had a total of five stab wounds in his chest and abdomen, with one severing a large blood vessel being fatal. The victim also had a laceration to the back of the scalp. A knife blade had penetrated and lodged in one of the victim's shoulder blades. The victim had fresh abrasion marks around the face and forehead, on the back of both hands, around the left shin, and along the back of the torso. The victim also had a black eye, which Dr. Tracy calculated to be a day or two old, based strictly on the color of the bruising. The victim had a broken jaw and a cut lip, but without any mark of impact indicating how that came about. Dr. Tracy speculated that the jaw had been broken postmortem. According to Dr. Tracy, the victim appeared "wasted," suggesting a chronic disease or habitual excessive drinking. The toxicology report reflected that the victim's blood alcohol level was .30, which Dr. Tracy said was to the stage of very drunk  staggering, slurred speech, double vision and sometimes unconsciousness. Cocaine was detected in the victim's urine. Dr. Tracy said that the victim was pronounced dead at 6:07 a.m. He confirmed that he had seen no defensive knife wounds on the victim and given the victim's level of intoxication, he believed that the victim could have been lying out somewhere and not even realized he was being stabbed.
New Orleans Police Department Sergeant Joseph Narcisse, custodian of records for the police Communications Division, identified State Exhibit 1 as a recording of a 911 call to police that originated at 3:17 a.m. from 2114 Tricou Street. He identified a recording of a second call made at 3:26 a.m. from the same address; a third call made at 3:41 a.m. from 2137 Tricou Street; a fourth call made at 3:43 a.m.; and a fifth call made at 5:07 a.m. He also identified radio chatter that reflected that Unit 514 arrived on the scene. Although Sgt. Narcisse never testified as to what date the 911 calls were made, the defendant *783 did not dispute that these calls were made on the morning Llewellyn Howard was killed.
New Orleans Police Officer Rose Houston identified her trip sheet[1] for February 21, 2003, covering the time period 7 p.m. to 7 a.m. on February 22. Her trip sheet reflected that she was first called to 2114 Tricou Street at 3:15 a.m. on a "fight" or 103-F call. Officer Houston testified that when she pulled up she observed people standing about, including at least two males and one female. There was no fight ongoing at the time she arrived. She asked one of the males what was going on, and he replied, "Everything all right." The officer marked the call as "necessary action taken" and left the scene at 3:20 a.m. Officer Houston was called to 2114 Tricou Street a second time, arriving at 3:50 a.m. The two males were no longer on the scene, so she marked the call as "no complainant on arrival" and drove off. Several blocks farther down on Tricou Street, Officer Houston saw Ms. Troy Harvey, the female who was at the scene on the first call. She picked her up and drove around the Lower Ninth Ward in the police unit looking for the car in which the two males had driven away. Unable to locate the vehicle, Officer Houston dropped Ms. Harvey off at a bus stop. Shortly thereafter, Officer Houston received a call at 5:30 a.m. of a homicide on Tricou Street.
New Orleans Police Department Sergeant Lawrence Green testified that he was the lead detective on a homicide that occurred on February 22, 2003, in front of 2041 Tricou Street. After Cedric Howard and Mr. Rubin gave him the defendant's name, Sgt. Green presented a photo lineup to them; both men identified the defendant's photo. Sgt. Green later located and talked to Ms. Harvey regarding Llewellyn's death.
Sgt. Green further testified that the defendant, during an interview at police headquarters, told him that he and Llewellyn had fought about the defendant's wallet, but that he had found it, and had taken and dropped off Llewellyn back at home. The defendant told Sgt. Green that his white car, which he had purchased one day before Llewellyn was killed, had been stolen on the date he was arrested, which was three or four days after the killing. The defendant said he had gone to a corner store and left his keys in the ignition, and the vehicle was stolen. The defendant told the sergeant that the clothes he was wearing on the night/morning of the killing  except for the jacket, which was in his car when it was stolen  were the same ones he was wearing at the time of the interview. He turned them over to the police. Sgt. Green said the clothes were tested for blood evidence, but none was found. Sgt. Green testified that a witness reported that the defendant had been wearing dark-colored pants, and that the pants he was wearing at the time of his arrest were not dark-colored.
Sgt. Green testified that the defendant had a wallet on his person when he was booked into Orleans Parish Prison. A Louisiana driver's license found inside, issued in the year 2000, listed the defendant's address as 2041 Tricou Street. Sgt. Green confirmed that he examined the defendant for any signs of possible injury he might have incurred as the result of an altercation with the victim, such as any cuts, but found none. As to the delay between the time Llewellyn was seen leaving *784 with the defendant and Ms. Harvey in the defendant's car and the discovery of his body, Sgt. Green testified, "I believe it was under an hour."
Ms. Harvey testified that one night in February 2003, while waiting for a bus, the defendant offered her a ride. She later saw the defendant and another man get into a fight over a wallet, but never saw the defendant with a weapon. Ms. Harvey said she left the scene along with the defendant and the other man, in the defendant's car, but that the defendant dropped her off at a bus stop at St. Claude and Delery Streets. Ms. Harvey confirmed that when the three of them got into the car there was no ongoing fight between the defendant and the other man.

ERRORS PATENT
A review of the record reveals no errors patent.

ASSIGNMENT OF ERROR NO. 1
In this assignment of error, the defendant questions the sufficiency of the evidence. Specifically, he argues that the circumstantial evidence was insufficient to meet the State's burden of proving that he was the person who killed Llewellyn Howard.
This court set out the well-settled standard for reviewing convictions for sufficiency of the evidence in State v. Ragas, 98-0011 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La. 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
Ragas, 98-0011, pp. 13-14, 744 So.2d at 106-107, quoting State v. Egana, 97-0318, *785 pp. 5-6 (La.App. 4 Cir. 12/3/97), 703 So.2d 223, 227-228.
With regard to circumstantial evidence and a reasonable hypothesis of innocence, the reviewing court does not determine whether another possible hypothesis has been suggested by the defendant that could explain the events in an exculpatory fashion. Rather, it evaluates the evidence in the light most favorable to the prosecution and determines whether the alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. State v. Captville, 448 So.2d 676, 680 (La. 1984).
Manslaughter is defined by La. R.S. 14:31(A) as:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or
(2) A homicide committed, without any intent to cause death or great bodily harm.
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person; or
(b) When the offender is resisting lawful arrest by means, or in a manner, not inherently dangerous, and the circumstances are such that the killing would not be murder under Article 30 or 30.1.
If the evidence in the instant case is sufficient to establish that the defendant killed Llewellyn Howard, then the evidence is sufficient to support his conviction for manslaughter. The only disputed issue is whether, viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found that the defendant was the person who killed Llewellyn Howard.
The defendant argues that the State failed to exclude the reasonable hypothesis of innocence that someone other than he killed the victim.
The evidence establishes that the defendant and Llewellyn Howard were "getting loaded" in the Howard home, either on the night of February 21, 2003, or in the early morning of the next day, hours before the victim was killed. The defendant left the Howard residence, but returned at approximately 2:30 or 3:00 a.m. on the morning of February 22, 2003. He rang the doorbell, and, in a rage, ranted to Cedric Howard that he wanted his "F-ing wallet." Llewellyn Howard awakened, went outside with the defendant, got into the defendant's car with him, and drove to the 2000 block of Tricou Street. When they exited the vehicle, the defendant began beating Llewellyn. The evidence is undisputed that the defendant repeatedly beat Llewellyn, while Llewellyn did little to defend himself. As he beat Llewellyn the defendant was yelling that he wanted his wallet. Cedric Howard also heard the defendant yell, "There going to be a death wish tonight."
Cedric Howard called the police, but by the time an officer arrived the defendant had temporarily ceased beating Llewellyn. Someone, either Llewellyn or the defendant, told the officer that everything was okay, and the officer left. That was at 3:20 a.m. Then the defendant and Llewellyn *786 started walking back from the 2000 block of Tricou Street toward the Howard home. The defendant started beating Llewellyn again, yelling that he wanted his wallet. Cedric Howard heard the defendant again say, "There going to be a death wish tonight" and "I'll do 30 years." The fighting stopped, and Mr. Rubin heard the defendant say, "Why you didn't tell me this before?" Then the defendant, Llewellyn Howard, and Ms. Harvey entered the defendant's vehicle and drove away. Ms. Harvey was soon dropped off at a bus stop. Meanwhile, the police had been called again, but by the time Officer Houston arrived back on the scene at 3:50 a.m., the trio had driven off. Cedric Howard, who had gone inside of his residence, came out and discovered the defendant and Llewellyn had left. He and his other brother, Elston, left to drive around looking for the defendant and Llewellyn for approximately ten to fifteen minutes. Officer Houston picked up Ms. Harvey at the bus stop where the defendant and Llewellyn had dropped her off, and they drove around the area looking for the defendant and Llewellyn. Neither the Howard brothers nor Officer Houston found them. A 911 call was made to police at 5:07 a.m., reporting what apparently turned out to be Llewellyn's body. Officer Houston got a dispatch some twenty minutes later, at 5:30 a.m., alerting her of the homicide.
The defendant turned himself in four days after the stabbing death of Llewellyn, after hearing that he was wanted. The defendant was arrested for killing Llewellyn, and admitted to Sgt. Lawrence Green that he had fought with Llewellyn about his wallet. However, the defendant said he had found his wallet, and had dropped Llewellyn off back at the Howard residence that morning. The defendant also told Sgt. Green that his car had been stolen the day he turned himself in and, at the time, he had been living in it for three or four days. There was no evidence that the victim had been stabbed or killed in a vehicle, or anywhere else other than at the location where his body was discovered.
The police seized the clothes the defendant was wearing at the time of his arrest, which the defendant said were the same ones he had worn on the night/morning of the fight with Llewellyn. No traces of blood were found on them. One witness said the defendant had been wearing dark pants, and the pants the defendant was wearing at the time he turned himself in were, as described by Sgt. Green, "regular" in color. Although the defendant had no signs of being injured by a knife, Sgt. Green testified there was no evidence that the perpetrator had been injured while stabbing the victim to death.
In State v. Brown, XXXX-XXXX (La.5/20/02), 846 So.2d 715, the defendant was convicted of manslaughter after a bench trial. The court of appeal reversed on sufficiency grounds.[2] The Louisiana Supreme Court reversed. The evidence was somewhat disputed as to who the victim had last been seen alive with on the night and early morning hours of April 5 and 6, 1999, because of the different times given by various witnesses. However, many of the witnesses had been intoxicated. The victim's body was discovered at approximately 11 a.m. on April 7, 1999, on a wooded trail used as a shortcut to some housing projects. The Supreme Court found the evidence sufficient to support the conviction because the defendant had acknowledged being with the victim in close proximity to where her body was found, around the time she was last seen alive; an eyewitness observed the defendant in that area forcibly restraining the *787 crying victim, who was begging to be released from his grasp; and the defendant admitted to striking the victim with his open hand when he caught her trying to steal his money, again, around the time she was last seen alive.
In the instant case, the defendant had beaten and threatened to kill Llewellyn Howard minutes before he was last seen alive in the company of the defendant. The defendant was in a rage, and probably intoxicated, as he said himself that he and Llewellyn had been getting "loaded" earlier in the evening. Any rational trier of fact could have found that the defendant twice threatened to kill Llewellyn, based on the defendant's comment, made in a rage while beating Llewellyn, that: "There going to be a death wish tonight." At some point after making the first "death wish" comment, the defendant stopped beating Llewellyn. However, he subsequently started pummeling him again, and again uttered the "death wish" comment.
The defendant's driver's license, issued in the year 2000, listed 2041 Tricou Street as his address, a block from the Howard residence. The defendant lived out of his car after Llewellyn was killed. Any rational trier of fact could have inferred that the defendant was fleeing from police by living out of his car. Flight is a circumstance from which guilt may be inferred. State v. Plaisance, XXXX-XXXX, p. 16 (La.App. 4 Cir. 3/6/02), 811 So.2d 1172, 1186. However, flight alone cannot be sufficient to prove guilt. State v. Benjamin, 97-3065, p. 3 (La.12/1/98), 722 So.2d 988, 989.
That seemingly the fighting had been resolved, and the defendant apparently pacified, by the time he and Llewellyn drove off together does not preclude the fact that he flew into another rage and, instead of beating Llewellyn this time, stabbed him to death. The exculpatory thought suggested by the defendant is that he would not have killed Llewellyn in front of his home, where he earlier had beaten and threatened to kill him. However, that suggests a rational defendant and a thoughtfully planned homicide. The evidence establishes that the defendant was not acting rationally and thoughtfully that night.
The defendant notes that Llewellyn Howard had a black eye that Dr. Tracy said was one or two days old, which, the defendant suggests, indicated that Llewellyn had "other enemies." The defendant also notes that Llewellyn had cocaine in his system and probably was a habitual alcohol abuser. Thus, the defendant suggests, Llewellyn was "actively involved in the street life." This is purely speculative, as opposed to the known facts that the defendant, in a rage, had beaten and threatened to kill Llewellyn within approximately one and one-half hours before he was stabbed to death, and that Llewellyn was last seen alive with the defendant in that same time frame.
Viewing all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the defendant stabbed Llewellyn Howard to death, and that all of the essential elements of the offense of manslaughter were proven beyond a reasonable doubt.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 2
In this assignment of error, the defendant argues that his maximum sentence of forty years at hard labor is constitutionally excessive.
La. Const. art. I, § 20 explicitly prohibits excessive sentences; State v. Baxley, 94-2982, p. 4, (La.5/22/95), 656 So.2d 973, 977. Although a sentence is within the *788 statutory limits, the sentence may still violate a defendant's constitutional right against excessive punishment. State v. Brady, 97-1095, p. 17 (La.App. 4 Cir. 2/3/99), 727 So.2d 1264, 1272. However, the penalties provided by the legislature reflect the degree to which the criminal conduct is an affront to society. Baxley, 94-2984 at p. 10, 656 So.2d at 979, citing State v. Ryans, 513 So.2d 386, 387 (La. App. 4 Cir.1987). A sentence is constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime. State v. Johnson, 97-1906, pp. 6-7 (La.3/4/98), 709 So.2d 672, 677. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. Baxley, 94-2982 at p. 9, 656 So.2d at 979.
In reviewing an excessive sentence claim, an appellate court must determine whether the trial judge has adequately complied with statutory guidelines in La. C.Cr.P. art. 894.1, and whether the sentence is warranted under the facts established by the record. State v. Trepagnier, 97-2427, p. 11 (La.App. 4 Cir. 9/15/99), 744 So.2d 181, 189. If adequate compliance with La.C.Cr.P. art. 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of the case, keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged. State v. Ross, 98-0283, p. 8 (La.App. 4 Cir. 9/8/99), 743 So.2d 757, 762.
In State v. Soraparu, 97-1027 (La.10/13/97), 703 So.2d 608, the Louisiana Supreme Court stated:
On appellate review of sentence, the only relevant question is "`whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.'" State v. Cook, 95-2784, p. 3 (La.5/31/96), 674 So.2d 957, 959 (quoting State v. Humphrey, 445 So.2d 1155, 1165 (La. 1984)), cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). For legal sentences imposed within the range provided by the legislature, a trial court abuses its discretion only when it contravenes the prohibition of excessive punishment in La. Const. art. I, § 20, i.e., when it imposes "punishment disproportionate to the offense." State v. Sepulvado, 367 So.2d 762, 767 (La.1979).
La. R.S. 14:31(B) provides that whoever commits manslaughter shall be imprisoned at hard labor for not more than forty years. In the instant case the defendant received the maximum sentence, forty years. The court did make the sentence run concurrent with a thirty-year sentence the defendant was serving after pleading guilty to forcible rape, second-degree kidnapping and aggravated crime against nature  as requested by the defendant in a letter he wrote to the trial court.
In sentencing the defendant the trial court stated that it had taken into account the sentencing guidelines articulated in La. C.Cr.P. art. 894.1, and had balanced the aggravating circumstances of the case against any mitigating circumstances that would apply. The court referred to the presentence investigation report prepared on the defendant. The court noted the defendant's 1990 plea of guilty to the aforementioned charges of forcible rape and second degree kidnapping  charges that had been reduced from aggravated rape and aggravated kidnapping  and aggravated crime against nature. The court noted that thirty years of the sentence *789 meted out for that conviction was suspended, but that the defendant's probation had been revoked in that case after his conviction for the instant offense, and the thirty-year sentence at hard labor made executory. The court also noted a 1997 felony theft conviction, with a five-year sentence. The court noted the circumstances of the instant case, and stated that, considering the defendant's violent criminal history, any lesser sentence than the maximum would deprecate the seriousness of the instant offense.
The presentence investigation report prepared on the defendant, who was thirty-nine years of age at the time of the June 2006 sentencing, shows a history of arrests dating back to November 1983. Of the arrests  aside from the ones mentioned above  five were for battery, one for aggravated battery, one for armed robbery, two for aggravated assault, one for carrying a concealed weapon that had an obliterated serial number, one for aggravated burglary, two for simple burglary, three for theft, one for possession of stolen things, one for theft by shoplifting, two for disturbing the peace, and one each for resisting an officer and pandering. Of all these offenses, the defendant was convicted of only one  theft by shoplifting in 1985. However, a trial court "is entitled to consider the defendant's entire criminal history in determining the appropriate sentence to be imposed." State v. Ballett, 98-2568, p. 25 (La.App. 4 Cir. 3/15/00), 756 So.2d 587, 602.
The defendant had served approximately four and one-half years in prison  on the convictions for forcible rape, second-degree kidnapping and aggravated crime against nature.
The defendant cites a number of cases involving sentences meted out for manslaughter that were less than the maximum of forty years. However, the defendant fails to cite any facts in these prior cases where the defendant had a prior conviction for a serious violent felony offense, as he does in the instant case, and thus the instant case is distinguishable from all of those on that issue alone. The defendant also had numerous prior arrests, as previously noted.
This court has previously affirmed maximum forty-year sentences for manslaughter. See State v. Bell, 2002-2349 (La.App. 4 Cir.App. 8/6/03), 854 So.2d 429; State v. Jones, XXXX-XXXX (La.App. 4 Cir. 3/20/02), 814 So.2d 623; State v. Williams, 99-2355 (La.App. 4 Cir. 12/13/00), 776 So.2d 604.
In addition, as noted, the defendant's forty-year sentence for manslaughter is to run concurrently with the thirty-year sentence the defendant must serve for his conviction for forcible rape, second-degree kidnapping and aggravated crime against nature, after his probation was revoked. The trial court was not required to run these sentences concurrently. See La. C.Cr.P. art. 883.
Considering the foregoing, it cannot be said that the maximum sentence meted out to the defendant makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime. Thus, we conclude the trial court judge did not abuse her sentencing discretion.
There is no merit to this assignment of error.

DECREE
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] A trip sheet is a log kept by a police officer that documents the calls received from the police dispatcher during the course of his or her shift, the response time to each call, and any action taken by the officer.
[2] State v. Brown, XXXX-XXXX (La.App. 2 Cir. 6/12/02), 825 So.2d 596.