983 So.2d 200 (2008)
STATE of Louisiana
v.
Arthur J. SIMMONS.
No. 2007-KA-0741.
Court of Appeal of Louisiana, Fourth Circuit.
April 16, 2008.
*201 Keva Landrum-Johnson, District Attorney, Payal Patel, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellant.
Christopher A. Aberle, Louisiana Appellate Project, Mandeville, LA, for Defendant/Appellant.
(Court composed of Judge MICHAEL E. KIRBY, Judge TERRI F. LOVE, Judge DAVID S. GORBATY).
MICHAEL E. KIRBY, Judge.
STATEMENT OF THE CASE
Defendant Arthur J. Simmons was charged by bill of information on January 25, 2005 in Count One with simple arson, a violation of La. R.S. 14:52, and in Count Two with simple burglary, a violation of La. R.S. 14:62. The information was amended on January 31, 2005 as to Count One, changing the charged offense to attempted simple arson, a violation of La. R.S. 14:(27)52. On that same date defendant appeared for arraignment and pleaded not guilty to both counts. The trial court found probable cause and denied defendant's motion to suppress the identification on February 28, 2005. The trial court found defendant temporarily incompetent to proceed on March 7, 2005, pending a competency hearing. Defendant was found competent to proceed at a March 31, 2005 competency hearing. On June 20, 2005, defendant was tried by a six-person jury and found guilty as charged as to both counts. On July 12, 2005, defendant filed a written motion for post-verdict judgment of acquittal and alternative motion for new trial. On February 15, 2007, the trial court granted defendant's motion for post-verdict judgment of acquittal. The trial court granted the State's motion for appeal on February 16, 2007.
*202 FACTS
Gerald Meredith testified that in November 2004 he was employed by Virginia's Christmas Tree Shop as the Christmas tree lot manager/foreman. Meredith said he had known defendant for two or three years, and that Meredith's employer, Craig Collier, had leased property from defendant to operate a Christmas tree lot. On the day in question, November 17, 2004, Meredith, Eddie Knighten, and two other employees arrived at the Carrollton Avenue lot to see defendant just outside of the fenced and locked Christmas tree lot. He specifically stated that when he arrived he "spotted someone with a grocery cart." The "someone" was defendant. Meredith testified that defendant was "pulling the gate back together for to show where he couldn't break in." He later testified that when he arrived defendant was outside the gate, stooping down, pulling the fence in. However, Meredith also testified that before the incident in question happened, there was a hole in the fence that he had patched up, and he said it was "this same spot where this incident happened is where the merchandise was taken out of." He later testified that whoever broke in got in on the side next to the gas station next door. When Meredith saw defendant with the grocery cart, he directed Knighten to check a trailer on the lot that was always kept locked. Meredith said almost everything they kept in the trailer, including a blower, was missing. He noticed the grocery cart defendant had contained a blower. Meredith testified that he and Knighten went around the corner, stopped defendant, and asked for their things back. The things included two blowers, a generator, rakes and shovels. They retrieved their belongings from the grocery cart and let defendant go. Meredith's boss, Craig Collier, then pulled up. Meredith said he told Collier that defendant, calling him by his name, "A.J.," had grabbed some stuff. Meredith said Collier asked why they had not held defendant, and Collier then ran and tried to catch up to defendant.
Meredith said the trailer was always kept locked, that he was the "lock person," that he checked it every day before he left to make sure that no one could break in, and that he checked it every morning. Meredith testified that there were only two ways to get into the trailer, through the back door and a side door, and he indicated that the person broke through the back door from the inside to make it look like it had been broken into through the back. Meredith testified that there were empty gas cans in the trailer, but that they did not keep gas in them because they were afraid that a lightning strike might blow it up. He said they did not keep Sterno or matches in the trailer. Later in his testimony, when asked about anything combustible in the trailer, Meredith said the only thing inside of the trailer was gas. He said that when he went inside the trailer on the day of the incident "they had like gas stuff all around the building like if he was about to be set up so that they could drop (inaudible)." Meredith admitted on cross examination he had a prior conviction for possession of crack cocaine, but he said he had been innocent. Meredith denied telling police he heard a noise coming from inside of the trailer; he said he had not heard a noise coming from inside of the trailer. Meredith identified photographs of the scene. Asked who was in possession of the grocery cart and the items inside of it when they arrived on the scene, Meredith replied that it had been defendant.
Eddie Knighten testified that on the day in question, November 17, 2004, "we" walked to the Christmas tree lot, which contradicted Gerald Meredith, who testified he picked Knighten up and drove him to work that day. Knighten said that *203 when they arrived he saw defendant "with a basket full of stuff" by the gas station next door. He said defendant was "[p]utting stuff in the basket." Knighten said he knew defendant from when defendant worked with them selling Christmas trees a couple of years previously. Asked whether the Christmas tree lot was open or fenced in, Knighten replied: "Fenced in, iron gate all around." Knighten said the side door to the trailer was open, and inside there was a lit candle. An interior wall had been kicked in. Most of their tools, a generator, shovels, etc. were missing. Knighten said that when he first arrived at the scene he did not hear a noise from inside the trailer, and did not report to police that he heard noises coming from inside the trailer. Knighten admitted he did not see defendant inside of the lot or see him steal anything from the trailer. The only place he saw defendant was outside of the gas station next door. Knighten said defendant had a tank of gas by the gas station.
Virginia Collier testified that in November 2004 she owned a lot at 3215 Carrollton Avenue used as a Christmas tree lot, "Virginia's Trees." She said Gerald Meredith was in charge of the lot. He was not there on a daily basis but maintained the lot and made sure people were not stealing things. She said Eddie Knighten and Darrell Mattix sold trees, unloaded trees, etc. Virginia Collier knew defendant. She said she wanted a piece of defendant's property three years previously to set up a Christmas tree lot on Earhart Boulevard. She had paid defendant some money and had some conversations with him. She had not talked to him since that time. She did not give him permission to enter her trailer or give him or anyone else permission to start a fire there.
Craig Collier, Virginia Collier's father, testified that he sold Christmas trees for approximately thirty years before selling his business to his daughter three to four years previously. Craig Collier said defendant had been a competitor of his, operating a Christmas tree lot on Earhart Boulevard that was near the lot involved in the instant case. Craig Collier said he and defendant were not friendly, essentially accusing defendant of having torn down some of his Christmas tree signs over the years. He said that as of November 17, 2004, they had fenced in the Christmas tree lot. The fence had a gate and a lock, and enclosed a trailer in which they stored their tools. Craig Collier identified photographs of the scene, including what he described as a photograph of the grocery cart. He said the cart contained items such as an $800.00 generator he had purchased a day or two before the alleged burglary, and cases of nails on the bottom shelf of the cart. He said one photograph of the inside of the trailer depicted what he believed to be kerosene or mineral spirits, a lit candle right by the door, two or three cans of Sterno, one of which was lit, and ten or fifteen books of matches scattered around, within less than a foot of the kerosene or mineral spirits. Collier said the generator, blowers and chain saws that had been in the grocery cart weighed two or three hundred pounds, and each of the two cases of nails weighed fifty pounds.
Craig Collier testified that he arrived at the Christmas tree lot within a minute or two of 7:00 a.m. on the day in question and observed Eddie Knighten, Gerald Meredith and two other workers were engaged in some commotion at the front corner of the lot, right in front of the gas station next door. He observed a grocery cart full of things, and one of the workers called out: "He's stealing our stuff. We caught him. We got the stuff." Another hollered: "It's A.J. He's stealing our stuff." Collier said that at that point he jumped out of his truck and chased defendant *204 around the block, where he scuffled with him but was not able to apprehend him. During the scuffle defendant said to stop, asking to quit. Collier said he told defendant he was going to jail. Defendant walked away. Collier said he got back to the lot as the trailer was being opened. He saw the candle, which he said he had never seen on the lot before. It was not their candle and had not been on the lot prior to that day. He said there was a one or one and a half gallon red plastic container on a counter turned on its side, with the screw cap loose and something dripping out of it onto the counter and the floor. He said this was five or six inches away from the cans of Sterno, one lit, and ten, twelve or fifteen books of matches, none of which items they kept on the lot. The Sterno, matches and candle were on the floor. Collier said some of the matchbooks were from restaurants in the neighborhood, as well as from elsewhere. He described the matchbooks as an old collection of matches, not just something someone picked up the night before at the Five Happiness restaurant down the street from the lot. Collier said the fence around the lot had either been "unwired," cut open or spread open, at a location near the gas station next door. Collier provided police on the scene with defendant's name, and he later identified a photograph of defendant. Collier identified various photographs depicting the scene. Collier concluded his direct testimony by stating that when he used to rent a lot, apparently from defendant, defendant "always" accused Collier of not paying the full amount owed, and "always" said "one day I will get even with that because you still owe me this money."
Craig Collier stated on cross examination that they would keep gasoline on the premises for the generator, not the chain saws, which were electric. But he said that the overturned one or one and a half gallon can found leaking kerosene or mineral spirits on the day in question did not belong to them. Collier said he saw the tools in the basket, but he could not state specifically what particular items were in the basket. He said he chased defendant, and when he returned there were tools and equipment out on a slab that belonged to the business. Collier was asked whether the tools weighed approximately three hundred pounds, including the two fifty-pound cases of nails, and he replied in the affirmative. Collier confirmed that it was three years prior to the incident in question that he rented immovable property from defendant to use as a Christmas tree lot, property defendant previously had used to sell Christmas trees. Collier said he had never seen cans of Sterno on the property at issue in the instant case, that he was in and out all day, on different days, and that he sees just about everything.
A.J. Arnone, a fire and arson investigator with the New Orleans Fire Department, was qualified by stipulation as an expert in the field of arson investigation. Arnone testified that on November 17, 2004, he received a call of a fire at a Christmas tree lot on Carrollton Avenue. He observed some tools on the side of the trailer or shed used as the office for the lot. Inside he observed an interior wall that had been broken through to get to the compartment where tools had been stored. He observed on a countertop underneath a window a clear plastic bag containing approximately twenty-two books of matches. There was a one-quart container of what he described as "Filco Engine Extender Oil" on top of the counter, and a can of Sterno on the top shelf that was open. There was also a can of Sterno on the floor underneath the shelf. On the walls and on the floor there was a liquid which Arnone thought could have been gasoline. None *205 of the Sternos was lit when he got there. He said the engine extender oil was generally used inside of any engine, and that he had tried to ignite it but could not. He said it was not flammable. However, Arnone said that in his opinion there had been an attempt to burn the trailer down because there was something similar to gasoline or possibly mineral spirits on the wall and on the floor, and the Sterno was lit. He thought the liquid that was on the wall and the floor came from an open container that was on the shelf. Arnone admitted that the container could have just been knocked over, such as by someone rummaging or moving around, and the contents dripped onto the wallapparently where the shelf met the walland to the floor.
Arnone said there was a gasoline container in the trailer, although he did not know the contents of it. He said it appeared as though someone lit a Sterno hoping for gas fumes to build up enough for the building to catch on fire. Arnone conceded that the weather was cold that day and that someone could have lit a can of Sterno to warm themselves. However, he said someone doing that in the trailer with flammable liquid insidereferring to the stuff on the wall and on the floor would have been risking his life. Arnone did say it was done that day because if it had been done the night before the candle and Sterno would have burned themselves out or burned up the trailer if the flammables on the wall and the floor had ignited.
New Orleans Police Officer Berwick Nero, called as a witness by the defense, confirmed in his testimony that on November 17, 2004 he investigated a reported burglary at 3216 South Carrollton Avenue, the site of a Christmas tree lot. He interviewed Gerald Meredith, Craig Collier, whom he characterized as the owner, and Eddie Knighten. Officer Nero was asked: "Did the trailer show inside any forced entry?" Officer Nero replied: "Not that I recall." When Officer Nero arrived there was a "basket" on the premises, but it was empty. He identified a photograph of what he said depicted all of the property that had been alleged to have been in the basket. Officer Nero replied in the negative when asked whether there was any evidence like DNA, blood evidence or identification that defendant might have left there that established that he may have been inside of the trailer. The officer testified that Gerald Meredith told the officer that as he walked into the lot he heard noises coming from inside of the trailer, as if someone was inside. Officer Nero confirmed on cross examination by the State that he did not memorialize Meredith's statement at the time he gave it, and that he wrote it in his report from memory. Officer Nero indicated on recross examination that Meredith did not review the officer's report to confirm that the statement attributed to him concerning noises from inside the trailer was correct, and that the officer did not give Meredith the opportunity to read the police report.
Officer K.T. Lewis, called as a witness by the defense, replied in the affirmative when asked whether he heard Gerald Meredith tell Officer Nero that he heard noises coming from the inside the trailer when Meredith arrived on the scene, as if someone was inside of the trailer. Officer Lewis admitted that he did not memorialize Meredith's statement, but he just remembered it. Officer Lewis did not write the report; Officer Nero did.
Defendant testified on his own behalf. He said he had been steadily employed since he was sixteen. He said he was in the auto towing business since 1974, while he was in high school, until the last few years when he underwent surgeries. He was employed in the business of buying *206 and selling salvaged automobiles at the time of the events in the instant case. He got into the Christmas tree business around 1982. However, on cross examination defendant was asked when he got out of the Christmas tree business, and he replied that it was in 1982. At the time of the incident in question defendant was living at Earhart Boulevard and Joliet Streets, on property he owned, where he had lived for twenty-five years. On the morning of the incident he did what he did on most mornings, took a walk. He said he took morning walks lots of times and would end up at the McDonald's or the Shell station, which is at the corner of South Carrollton and Earhart Boulevard. Defendant said he had arthritis and pain in his back. He had two major back surgeries, one in 1998 and one in 2002. In 1998 they removed a disc and replaced it with titanium. In 2002 they put steel rods and screws in his back. Defendant said that on the morning in question he walked to McDonald's and got something to eat and coffee. He said coming back he ended up on Earhart Boulevard, and some guy standing by a basket called out to him, "Hey homeboy. I got something over here." Defendant asked what he had, and the guy said he had these tools. Defendant said he asked the guy what he was going to do with all the tools. Defendant said he did not quite understand what the guy was saying, but the guy essentially was asking him if he wanted to buy the tools. Defendant declined. Defendant said the guy eased around the corner, in a quick shuffle, apparently when the guy saw the Christmas lot employees coming.
Defendant said he told Meredith and Knighten that the guy went around the corner. Defendant said Craig Collier came up behind him and clobbered him, knocking him to the ground. The two had some "exchanges." Defendant said he eased off and walked home. He said he did not stick around because he was hurting. Later, when asked why he shuffled off instead of staying around, defendant said he did so because the workers who saw him with the tools were asking him what he was doing with the tools. Defendant denied entering the Christmas tree lot or trailer at any time that morning or the previous night. He denied stealing the tools, saying that he probably had two or three of everything Collier had, and noting that he had been selling Christmas trees for twenty years or longer. Defendant replied in the negative when asked whether he was able to run very far. He later said he could not run, but could shuffle probably twenty or thirty feet. Defendant said he would not be able to push a three hundred or even a two hundred pound basket because of his back. Defense counsel attempted to introduce some x-rays that had no names or identification on them to link them with defendant, but the trial court sustained the State's objection to them. Defendant said he had degenerative disease of his bone, and he had four titanium cages put in place of a disc, which did not remedy his problems. He subsequently had two steel rods, three steel plates, and six screws surgically placed in his back. He said he could not pick up any weight because of the condition.
Defendant said on cross examination that at the time of the incident he lived approximately five blocks from the Colliers' Christmas tree lot. Asked what medication he was on for his arthritis, defendant said he had been taking Vioxx for a while. But, he had no prescriptions for Vioxx to show the court. Defendant admitted that on the day of the incident he was taking daily doses of methadone that he obtained from a methadone clinic on Tulane Avenue. However, he had not been to the clinic for his daily methadone *207 dose at the time of the events in question, around 7:00 a.m. Defendant was asked about a description of the guy who tried to sell him the tools. He said it was a black male, approximately six feet tall, wearing dark clothing, jeans and a jacket. Defendant was asked why he would have stopped to talk to someone who obviously was fencing goods. Defendant replied that he had been around that neighborhood twenty-five to thirty years and had never had any problems, and he had no reason not talk to someone who called him over. Defendant recalled that there was a generator in the basket. Asked if he had ever told police about the black male who had the basket full of tools, defendant said he talked to somebody at the Second Police District station who told him they had an attachment out for him for simple burglary. He said he mentioned to a police sergeant at that station that a black male had the tools. Defendant said he did not know if his defense attorney had any medical records to back up his claim of disability.
At the hearing on the motion for post verdict judgment of acquittal or, alternatively, for new trial, the trial court noted that defense counsel had failed to lay a proper foundation or otherwise properly introduce defendant's medical records to substantiate his defense that he had significant back problems which would call into question his ability to push a basket filled with what the trial court recalled was three to five hundred pounds of tools, nails, etc. The trial court stated "in connection with a hearing on post verdict judgment of acquittal," defense counsel was able to lay the proper foundation for those medical records. The trial court stated that it was thus proven to the court that defendant had significant pathology of his lower back, although the court could not remember the exact diagnosis, whether it was a fracture or disc herniation(s) in the lumbar area. The court noted that prior to the date of the offenses defendant had titanium rods and screws surgically implanted into his lumbar spine region to provide stability and as an attempt to relive pain. The court stated that the surgery did not relieve defendant's pain symptoms, and that during the time period in question defendant had been actively under the care of a pain management physician who was treating him with, inter alia, Methadyl. The trial court further noted that it was proven at trial, "and at the post conviction hearing," that defendant was disabled on the date of the bill of informationapparently meaning on the date of the offense as specified in the bill of information. The trial court stated that the testimony at trial was that defendant was pushing a grocery basket full of boxes of nails and chainsaws, various equipment and hardware, that was estimated to weigh between three and five hundred pounds. The trial court found that, based on the medical evidence, it would have been physically impossible for defendant to have done what the State's witnesses said he did.
The trial court further found Gerald Meredith and Eddie Knighten were not credible witnesses, and in fact they had committed perjury. The court cited their testimony that they did not tell police they heard noise coming from inside of the trailer when they arrived on the scene, which contradicted the testimony of New Orleans Police Officers Nero and Lewis who, the court stated, testified that the witnesses had reported hearing such noises. The trial court stated that it was obvious from the testimony of Officers Nero and Lewis that whoever set the trailer on fire acted with an accomplice. The trial court said there were two people involved, with one person making off with the stolen goods and one staying behind to *208 set the shed on fire. The trial court stated that when "they," obviously meaning Meredith and Knighten, showed up "they heard somebody moving around in the shed. They see another man leaving." The trial court stated that it would have been impossible for anyone, obviously meaning defendant, to have been in two places at the same time. "He could not have been inside the shed setting it on fire and making good his getaway with the stolen goods a block or two away."
The trial court also stated that Assistant District Attorney Bobby Freeman, who tried the case against defendant, filed a motion to designate Officer Nero as the case agent and to permit him to sit in the court and not be subject to the sequestration rule. The trial court stated that when it became obvious to Freeman that "these witnesses," presumably referring to Gerald Meredith and Eddie Knighten, told a story that was diametrically opposed to the story that they told Officer Nero on the day of the incident, Freeman "literally turned to Officer Nero and told him to leave." The trial court stated that Officer Nero grabbed his partner, Officer Lewis, and took him with him "on Mr. Freeman's instructions."
The trial court concluded: "The evidence viewed in a light most favorable to the state does not reasonably permit a finding of guilty."
ASSIGNMENT OF ERROR
The State argues that the trial court erred in granting defendant's motion for post verdict judgment of acquittal, as the evidence was sufficient to sustain the convictions.
La.C.Cr.P. art. 821 provides for the motion for post judgment of acquittal, and states:
A. The defendant may move for a post verdict judgment of acquittal following the verdict. A motion for a post verdict judgment of acquittal must be made and disposed of before sentence.
B. A post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty.
C. If the court finds that the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense, the court, in lieu of granting a post verdict judgment of acquittal, may modify the verdict and render a judgment of conviction on the lesser included responsive offense.
D. If a post verdict judgment of acquittal is granted or if a verdict is modified, the state may seek review by invoking the supervisory jurisdiction of or by appealing to the appropriate appellate court.
E. If the appellate court finds that the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense, the court, in lieu of granting a post verdict judgment of acquittal, may modify the verdict and render a judgment of conviction on the lesser included responsive offense.
A motion for post verdict judgment of acquittal raises the question of the sufficiency of the evidence. State v. Macon, XXXX-XXXX, p. 5 (La.App. 4 Cir. 2/1/06), 925 So.2d 618, 621, reversed on other grounds, 2006-481 (La.6/1/07), 957 So.2d 1280; see also State v. Thibodeaux, 98-1673, p. 12 (La.9/8/99), 750 So.2d 916, 926.
This court set out the well-settled standard for reviewing convictions for sufficiency of the evidence in State v. Ragas, 98-0011 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, as follows:

*209 In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
Ragas, 98-0011, pp. 13-14, 744 So.2d at 106-107, quoting State v. Egana, 97-0318, pp. 5-6 (La.App. 4 Cir. 12/3/97), 703 So.2d 223, 227-228.
A court reviewing a conviction for sufficiency is not permitted to decide whether it believes the witnesses; it is not the function of an appellate court to assess credibility. State v. Marcantel, XXXX-XXXX, p. 9 (La.4/3/02), 815 So.2d 50, 56. In a case where there is no physical evidence to link a defendant to the crime charged, the testimony of one witness, if believed by the trier of fact, is sufficient support for a factual conclusion required for a verdict of guilty. Id. In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Robinson, XXXX-XXXX, p. 16 (La.4/14/04), 874 So.2d 66, 79; State v. Jones, 97-2591, p. 7 (La.App. 4 Cir. 9/8/99), 744 So.2d 165, 169.
The State correctly argues that the trial court erred in its ruling on defendant's motion for post verdict judgment of acquittal because the court weighed the credibility of two of the State's witnesses. In addition, the court erred factually by stating that Eddie Knighten told police that he heard noises coming from inside of the trailer.[1] There was no testimony *210 that Knighten made any such statement to anyone. Officers Nero and Lewis testified that Gerald Meredith stated that he heard someone inside of the trailer when he arrived on the scene and first walked up to the trailer. The fact that Meredith maintained during his testimony that he did not make such a statement does not constitute internal contradiction or irreconcilable conflict with physical evidence. The trial court erred as matter of law in evaluating the credibility of Gerald Meredith and Eddie Knighten on this issue, and in granting defendant's motion for post verdict judgment of acquittal, in part, on this ground.
Moreover, the trial court erred in considering evidence that was not admitted at trialmedical evidence concerning the physical condition of defendant's backas the other ground of its judgment granting the motion for post verdict judgment of acquittal.
Defendant erroneously cites State v. Hearold, 603 So.2d 731 (La.1992), for the general proposition that "an analysis of the sufficiency of the evidence properly includes an examination of both admissible and inadmissible evidence." In Hearold, the Louisiana Supreme Court explained that when a defendant raises on appeal issues both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence, considering "the entirety of the evidence, including inadmissible evidence which was erroneously admitted. . . ." Hearold, 603 So.2d at 734. This reference to inadmissible evidence in Hearold is to evidence that was admitted in the trial court and considered by the trier of fact, but it is alleged on appeal to have been inadmissible evidence that was improperly admitted. In the instant case there was no inadmissible evidence improperly admitted. The evidence to which defendant refers, the medical evidence concerning the condition of defendant's back, was deemed inadmissible and was not admitted. The trier of fact in the instant case did not consider any such evidence because it never heard or viewed it. The trial court erred as a matter of law in considering evidence which it had deemed inadmissible at trial, and which was not admitted, when it ruled on defendant's motion for post verdict judgment of acquittal.
Defendant was charged with and convicted of simple burglary, a violation of La. R.S. 14:62, and attempted simple arson, a violation of La. R.S. 14:(27)52.
La. R.S. 14:62 provides in pertinent part:
A. Simple burglary is the unauthorized entering of any dwelling, vehicle, watercraft, or other structure, movable or immovable, or any cemetery, with the intent to commit a felony or any theft therein,. . . .
La. R.S. 14:24 provides:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
Thus, to convict defendant of simple burglary the jury had to conclude beyond a reasonable doubt that someone made an unauthorized entry into the trailer, where, the testimony established, all the items found in the grocery basket were kept, with the intent to commit a theft therein, *211 and that defendant was a person concerned in the commission of that crime.
It is not disputed in the instant case that no one observed defendant or anyone else make an unauthorized entry into the trailer, or even into the fenced-in Christmas tree lot. However, defendant admitted that he was on the scene, near a grocery basket filled with what two employees of the lot said were items taken from the trailer inside of the fenced-in lot, and that he left the scene because the lot employees were accusing him of stealing their tools. One of the employees, Gerald Meredith, testified that when he pulled up around 7:00 a.m. he saw defendant with a grocery cart, putting stuff into the cart. He said defendant was pulling the gate back together. However, Meredith later testified that whoever entered the fenced-in lot had entered through a break in the fence he previously had patched up, on the side of the lot by the gas station next door. Craig Collier testified that the person gained entry into the fenced-in lot through a cut or section in the fence that had been rewired together, and then had been "unwired," cut open or spread open. Eddie Knighten referred to the fencing as "iron gate all around." Thus, a fair consideration of the trial testimony is that when Meredith arrived he saw defendant at the section of the chain link fence that he had previously patched up by rewiring it, and that defendant was pulling the unwired sections of the fence back together. When Meredith and Eddie Knighten went to the trailer to investigate, they discovered it had been broken into and that tools and other items had been taken. Meredith testified that he and Knighten chased after defendant, caught him, retrieved the items that had been taken from the trailer, but let defendant go. While Craig Collier testified that he arrived on the scene to find his employees engaged in some commotion, he did not say that he saw defendant with the grocery cart full of tools. Rather, he heard his employees call out that defendant took their stuff. He asked them why they had not held defendant, and then he went around the corner to confront and wrestle or scuffle with defendant. Defendant denied breaking into the trailer and taking the tools, saying that a black male had the basket of tools and offered to sell them to him. Defendant's flight could have been considered indicative of guilt. See State v. Allen, XXXX-XXXX, p. 13 (La. App. 4 Cir. 3/7/07), 954 So.2d 779, 787, writ denied, XXXX-XXXX (La.11/9/07), 967 So.2d 502 ("Flight is a circumstance from which guilt may be inferred."). In addition, Craig Collier testified that some of the matchbooks scattered about the trailer were from restaurants in the neighborhood. Collier described the matchbooks as an old collection of matchbooks. Defendant admitted that at the time of the incident he had been living in the neighborhood  some five blocks from the Christmas tree lot  for twenty-five years.
In State v. Irvine, 535 So.2d 365 (La. 1988), police set up a surveillance of a mobile home park where a number of burglaries had recently occurred. The officers initially checked to insure that all mobile homes in the one-square block lot were locked. Three hours into the surveillance they observed two black males jump across a drainage ditch and enter the lot. The officers entered the lot and found the defendant, a black male, carrying a cardboard box between two trailers, one of which was used by the owner for storage or furniture and appliances. The door of the storage trailer was wide open, and there were two boxes leaning against the trailer. The owner identified the boxes as having been in the trailer. While the defendant was being arrested, police saw another black male land on the ground as if he had jumped from the open *212 door of the storage trailer. That male fled, but a black male named "Tippy" was subsequently found hiding under another trailer. Police could not identify Tippy as the one who had jumped from the trailer. The defendant was convicted of simple burglary, but Tippy was acquitted. The defendant's conviction was subsequently reversed on sufficiency grounds by the appellate court. The appellate court found that, although there had been an unauthorized entry into the trailer, the circumstantial evidence did not exclude the possibility that Tippy had broken into the trailer and put the boxes outside, and that defendant had simply happened onto the scene and carried one of the boxes away. The Louisiana Supreme Court reversed and reinstated the defendant's conviction for simple burglary, finding that, viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the defendant was a principal in the commission of the burglary, committed through his, Tippy's or someone else's unauthorized entry into the trailer.
In State v. Credit, 455 So.2d 1238 (La. App. 4 Cir.1984), police arrived at the scene of a business burglary about five minutes after receiving the call. They observed defendant down the block from the business, carrying a sack containing adding machines, a blender, a bushing machine and tools. A vice president of the company identified these items as belonging to the company. The defendant denied breaking into the business, saying that he was returning from work that evening when he bought the items from two men in a parked car near the business. The defendant was convicted of simple burglary. This court affirmed, finding that the circumstantial evidence excluded every reasonable hypothesis of innocence, and that the evidence overall was sufficient to find the defendant guilty of simple burglary beyond a reasonable doubt.
In State v. Housley, 577 So.2d 767 (La. App. 2 Cir.1991), a police officer patrolling a commercial area with his lights off at 2:30 a.m. observed a car backing out from the side of a plumbing company. Before the car reached the street it pulled forward and stopped alongside of the building for a minute or two. The car then backed and turned around in a parking lot in front of the building before driving off down the street with its lights off. The officer pulled over the car a half block from the business. The driver was arrested for driving with a suspended license, and an inventory search of the car turned up items which were later identified as having been stolen from one of the plumbing company's vans that had been parked behind the business. The arresting officer testified at trial that the defendant said he had gone behind the building to urinate, which the officer conceded would have been consistent with what he had observed. The defendant was convicted of simple burglary. The appellate court affirmed on sufficiency grounds, finding that the jury could have rejected the defendant's claims that he went behind the building to urinate, and that the items in his possession were not the ones stolen from the plumbing company van, but were merely similar items that could have been purchased at local stores. In affirming the defendant's conviction the appellate court cited the facts in Irvine, supra.
In the instant case, viewing the evidence in a light most favorable to the prosecution, any rational trier of fact, inferring from all the circumstances, and even accepting defendant's testimony that he had back problems, could have found beyond a reasonable doubt that defendant or an accomplice made an unauthorized entry into *213 the trailer with the intent to commit a theft therein.
Defendant was also convicted of attempted simple arson, a violation of La. R.S. 14:27(52). La. R.S. 14:52 defines simple arson, in pertinent part, as the "intentional damaging by any explosive substance or the setting fire to any property of another, without the consent of the owner. . . ." La. R.S. 14:27 defines an attempt as:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
B. (1) Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended.
(2) Further, the placing of any combustible or explosive substance in or near any structure, watercraft, movable, or forestland, with the specific intent eventually to set fire to or to damage by explosive substance such structure, watercraft, movable, or forestland, shall be sufficient to constitute an attempt to commit the crime of arson as defined in R.S. 14:51 through 53.
In the instant case, the evidence established that someone scattered numerous books of matches in the trailer and then lit a candle and a can of Sterno nearby. These items had not been seen in the trailer before defendant was discovered outside of the fenced-in lot with a grocery basket loaded with items taken from inside of the trailer. The evidence also established that there was a flammable liquid on the wall and the floor near the matches, candle and Sterno. It was the opinion of arson investigator Arnone that someone attempted to start a fire in the trailer by spreading the flammable liquid, matches and lighting the candle and can of Sterno. He said the evidence indicated that this attempt had been done that day, not the night before, because if it had been done the night before either the trailer would have ignited or the candle and the can of Sterno would have burned out. Craig Collier testified that some of the matchbooks scattered about the trailer were from restaurants in the neighborhood. Collier described the matchbooks as an old collection of matchbooks. Defendant admitted that at the time of the incident he had been living in the neighborhood  some five blocks from the Christmas tree lot  for twenty-five years. The owner of the Christmas tree lot, Virginia Collier, testified that she did not give defendant or anyone permission to start a fire in the trailer. In addition, the previously discussed evidence concerning the simple burglary must be considered.
Viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that defendant either attempted to set the trailer on fire, or was a principal to an attempt to set the trailer on fire.
Accordingly, we find merit to the State's assignment of error. The trial court erred as a matter of law by reweighing the credibility of witnesses Gerald Meredith and Eddie Knighten and by considering evidence that was never admitted at trial when ruling on defendant's motion for post verdict judgment of acquittal. Moreover, the evidence was sufficient to sustain the *214 convictions on both counts, and thus the trial court erred in granting defendant's motion for post verdict judgment of acquittal, both as to defendant's conviction for simple burglary and his conviction for attempted simple arson.
Defendant requests that in the event this court finds reversible error in the trial court's granting of defendant's motion for post judgment verdict of acquittal, this court grant defendant's motion for new trial. However, the motion for new trial should properly be heard by the trial court.
CONCLUSION
For the foregoing reasons, the judgment of the trial court granting defendant's motion for post verdict judgment of acquittal is reversed; defendant's convictions for simple burglary and attempted simple arson are reinstated; and, the matter is remanded to the trial court for consideration of defendant's alternative motion for a new trial and sentencing.
REVERSED AND REMANDED.
NOTES
[1] It can also be noted that there was no evidence that anyone saw a person leaving the trailer, as the trial court stated. Nor was there any evidence that the items in the grocery cart weighed up to five hundred pounds, as the trial court statedonly up to three hundred pounds.